# CASES DETERMINED

## August Term, 1876.

---

THE STATE ex rel. DRAKE vs. DOYLE, Secretary of State.

CONSTITUTIONAL LAW: REVOCATION OF STATE LICENSE TO FOREIGN COR-
PORATION: MANDAMUS: JURISDICTION OF SUPREME COURT OF THIS
STATE: INJUNCTION: JURISDICTION OF FEDERAL COURTS. *(1)* Orig-
inal jurisdiction of supreme court in mandamus. *(2)* Private interest of
relator, when immaterial. *(3–7)* Statutes requiring license of foreign
corporation to be revoked in certain cases, valid. *(8–10)* Jurisdiction of
federal courts to restrain state officer. *(11)* When writ of injunction
spent.

1. This court will take original jurisdiction of the writ of *mandamus*, upon
the mere relation of a private person, in the name of the state, to com-
pel the secretary of state to revoke, as required by statute, a state
license to a foreign corporation to transact business here, forfeited by
violation of its conditions.
2. The jurisdiction being assumed because the subject matter of the writ
affects the prerogatives of the state, and not being founded upon the
private right of the relator, a subsequent settlement between him and
the corporation, leaving him without further interest in the application,
is immaterial.
3. The fact that the statute requiring in a certain contingency a revocation of
the license of a foreign insurance company, makes no provision for *notice*
to the company, does not affect its validity.
4. The acts of the secretary of state in issuing and revoking licenses to foreign
insurance companies under the statute, are *ministerial* and not judicial,
although he is required to ascertain the existence of the facts upon which
his authority in each case is founded.

The State ex rel. Drake vs. Doyle, Secretary of State.

5. Save by the voluntary license of the state, a foreign insurance company has no right to carry on its business within this state; and the state has power to make such license subject to the company's forbearance of a right, and revocable upon the exercise of such right.

6. Those provisions of the statutes (ch. 56 of 1870 and ch. 64 of 1872) which authorize the issue of licenses to foreign insurance companies only upon condition of their filing a written agreement not to remove to the federal courts causes commenced against them in the courts of this state, and require the secretary of state to revoke such licenses upon a violation of that agreement, are valid.    *Ins. Co. v. Morse*, 20 Wall., 445, distinguished, and certain *obiter dicta* therein criticised.

7. So much of the statute as requires such agreement as a condition of license being designed as a compensation for the provisions authorizing licenses, if the former were held invalid, the latter would fall with it; the secretary of state in issuing the license here in question would have acted without authority; and the court would compel him to revoke it.

8. Where a suit is prosecuted in a federal court by a private party against a state officer who has no personal interest or liability in the action, but is sued in his official capacity only, to affect a right of the state only, the state is the real defendant, within the prohibition of the XIth amendment to the federal constitution.

9. A circuit court of the United States has therefore no jurisdiction of a suit by a foreign corporation to restrain a state officer from revoking (as required by the law of the state) a license granted the plaintiff corporation to do business in the state.

10. Even if the federal court had authority to bind *the officer* in such a case, it could not bind *the state* in the exercise of its authority.

11. A valid injunction restraining a state officer from revoking a license previously issued by state authority, would be spent with the life of such license, and would not apply to a new license subsequently issued under color of the same authority.

### APPLICATION for a *Mandamus*.*

---

* Sec. 22, ch. 56, Laws of 1870, provides as follows: "It shall not be lawful for any fire insurance company, association or partnership incorporated by or organized under the laws of any other state of the United States, or any foreign government, for any of the purposes specified in this act, directly or indirectly, to take risks or transact any business of insurance in this state unless possessed of the amount of actual capital required of similar companies formed under the provisions of this act; and any such company desiring to transact any such business as aforesaid by any agent or agents in this state, shall first appoint an attorney in this state, on whom process of law can be served, containing an

The State ex rel. Drake vs. Doyle, Secretary of State.

On the 16th of December, 1875, the relator filed his petition for a writ of *mandamus* commanding *Peter Doyle*, as secre-

agreement that such company will not remove the suit for trial into the United States circuit court or federal courts, and file in the office of the secretary of state a written instrument, duly signed and sealed, certifying such appointment, which shall continue until another attorney be substituted; and any process issued by any court of record in this state, and served upon any such attorney by the proper officer of the county in which such attorney may reside or may be found, shall be deemed a sufficient service of process upon such company; but service of process upon such company may also be made in any other manner now provided by law."

Sec. 3, ch. 13, Laws of 1871, provides as follows: " No officer, agent or sub-agent of any insurance company shall act or aid in any manner in transacting the business of insurance of or with such company, or placing risks, or effecting insurance therein, without first procuring from the secretary of state a certificate of authority so to do for each company for which he proposes to act, which shall state, in substance, that such company is duly authorized to do business in this state under the laws thereof, and that such agent or other person has duly complied with the laws relating to the agents of such companies. The secretary of state, upon being satisfied of the facts to be stated therein, shall grant such certificate, which, in case of fire, marine or inland companies, shall continue in force until the thirty-first day of January next after the date thereof .... unless sooner revoked by the secretary of state for noncompliance with the laws aforesaid, and shall be renewed on said days annually thereafter, as long as the company and its agents continue to comply with said laws."

Sec. 1, ch. 64, Laws of 1872, provides as follows: "If any insurance company or association shall make application to change the venue or remove any suit or action heretofore commenced, or which shall be hereafter commenced, in any court of the state of Wisconsin to the United States circuit or district court, or to the federal court, contrary to the provisions of any law of the state of Wisconsin, or contrary to any agreement it has made and filed, or may make and file, as provided and required by section number twenty-two (22) of chapter fifty-six (56) of the general laws of Wisconsin for the year A. D. 1870, or any other provision of law now in force in said state, or may hereafter be enacted therein, it shall be the imperative duty of the secretary of state, or other proper state officer, to revoke and recall any authority or license or certificate to such company to do and transact any business in the state of Wisconsin; and no renewal or new license or certificate shall be granted to such company for three years after such revocation, and such company shall therefore [thereafter] be prohibited from transacting any business in the state of Wisconsin until again duly licensed."

tary of state of the state of Wisconsin, to revoke "any author-
ity, or license, or certificate" theretofore issued to the Conti-
nental Insurance Company of the city of New York, by such
secretary of state, authorizing said company to transact any
business in this state.   The petition alleges that the petitioner
is a citizen of this state; that said company is incorporated
under the laws of New York, and not under the laws of this.
state; and that it is a fire insurance company, and for more
than five years last past has been engaged in taking risks and
transacting the business of fire insurance in Wisconsin.    It
further alleges, in substance, that in May, 1874, said insurance
company issued a policy insuring the Great Western Com-
pound Company, a corporation organized under the laws of
this state, upon certain real and personal property of said
compound company, situate in Winnebago county in this
state, and stipulating that any sum becoming due on such
policy should be payable to the petitioner; that the property
so insured was destroyed by fire in the following September,
and notice and proofs of loss duly sent to the insurance com-
pany, which refused to pay the amount of such loss; that
thereupon the petitioner commenced an action at law against
said insurance company in the circuit court for said county of
Winnebago, to recover the amount of damages claimed under
the policy; that the summons and complaint in said action
were duly served on said insurance company, March 13, 1875,
by delivering to one J. L. Hathaway, the duly authorized at-
torney of said company, duly appointed as its attorney in this
state on whom process of law could be served, a true copy of
said summons and complaint; and that afterwards, on the
13th of April, 1875, said insurance company made application
to the Winnebago county circuit court, at a general term
thereof begun on the day last named, to change the venue and
remove said action to the United States circuit court for the
eastern district of Wisconsin.    The petition sets out a copy of
the notice of this application, which was signed by *Finches,*

*Lynde & Miller,* as attorneys for said company, and also a copy of the application itself, which is signed "CONTINENTAL INS. CO., by Jno. L. Hathaway, its attorney for state of Wisconsin," and countersigned "*Finches, Lynde & Miller,* attorneys for defendant." The application is verified by Mr. Hathaway, who swears that he is the attorney of said defendant company, and makes the application in its behalf, etc. The petition further shows that Finches, Lynde & Miller, on the 27th of March, 1875, notified the attorneys for the plaintiff in said action that they had been retained for the defendant insurance company therein, and also caused their appearance for such defendant to be entered by the clerk of said circuit court. It further shows that upon the reading and filing of said application, and of the security offered by the defendant insurance company as required by law, and on motion of Finches, Lynde & Miller, as attorneys for said defendant, the Winnebago circuit court ordered the suit to be removed as prayed; and that the cause was thereupon removed, and the record duly sent to the United States circuit court above named, on the 14th of April, 1875. It further alleges that prior to the commencement of said action on the policy, said insurance company, in conformity with the statutes of this state, had executed a certain instrument under its seal, whereby it appointed said J. L. Hathaway its attorney in this state on whom process of law should be served, and which contained an agreement that said company would not remove a cause commenced against it in a state or circuit court of this state into the United States circuit court or federal courts, and said agreement had been duly filed in the office of the secretary of state of the state of Wisconsin. The petition further alleges that on the 8th of July, 1875, said *Peter Doyle,* as secretary of state, had full knowledge of the facts above set forth; that on or about the first day of that month, the petitioner caused to be served upon and filed with said *Doyle,* as such officer, a transcript of the proceedings in the above described action,

containing the application of said insurance company to remove said cause as aforesaid, and demanded of said *Doyle*, as such officer, that he revoke any authority, license or certificate previously granted to such company [authorizing it] to transact business in this state; but that the said *Doyle*, as such officer, refuses and neglects to revoke such authority, license or certificate, and, by reason of such neglect and refusal, said insurance company continues to do business in this state.

Upon this petition an alternative writ was granted, December 22, 1875. On the 1st of February, 1876, the respondent moved to quash the writ; and the motion was argued by the *Attorney General* for the respondent, and *C. W. Felker* for the relator. On the 15th of the same month, the motion was denied.

On the 6th of June, 1876, the respondent made return to the alternative writ. The return states: 1. That the authority, license or certificate issued by the respondent to the insurance company above named, to transact business in this state, was by its terms to continue in force from February 28, 1875, to January 31, 1876; and that said authority, license or certificate, and all right, power and privilege under or by virtue thereof, were fully ended and determined on the day last named. 2. That the respondent has been advised, and it is claimed and insisted by said insurance company, "that so much of sec. 22, ch. 56, Laws of 1870, as requires foreign insurance companies to file agreements not to remove cases to the United States courts, and as requires the secretary of state to cancel the licenses issued to them in case of the violation of such agreement in that regard, is unconstitutional and void, and that the supreme court of the United States has so decided; and the respondent respectfully submits to the determination of this court the question whether such provisions are unconstitutional and void, or are valid subsisting provisions of law." 3. That, upon a bill of complaint filed by said insurance company on or about the

28th of September, 1875, against said *Doyle* as secretary of state, the United States circuit court for the western district of Wisconsin, on the 8th of October, 1875, had issued its writ of injunction, a copy of which was attached to said return; and that said writ had never been vacated or modified. Attached to this return was a copy of the record in the aforesaid suit of the Continental Insurance Company of the city of New York against the present respondent, in the United States circuit court above named. The writ of injunction therein served upon the respondent commands him to " desist and refrain from revoking, annulling or cancelling, or taking any steps to revoke, annul or cancel, any certificate or license granted by the state of Wisconsin " to the above named insurance company, " authorizing it to do business in the state of Wisconsin; and from publishing in any newspaper, or in any form whatever, any such revocation, annulment or cancellation; and from doing any act whatever assailing or questioning the right of said company to do business in the state of Wisconsin, until the further order of this court in relation to these matters." 4. That the license mentioned in the relation expired on the 31st of January, 1876; that on the 18th of February, 1876, the respondent issued a new license to the insurance company named in said relation, dated February 18, 1876, which license is granted for and during the full period of time from its date until the 31st of January, 1877; and that said insurance company has in all things complied with the laws of Wisconsin in such case made and provided.

The relator demurred to the return as insufficient; and the demurrer was argued on the 7th of June, 1876.

*C. W. Felker*, for the relator, contended that, the question involved being one of public right, it was not necessary that the relator have an individual right to the thing demanded. *People v. Halsey*, 37 N. Y., 344–8, and cases there cited. 2. That the state has power to exclude a foreign insurance

company absolutely from doing business within its limits, and may exercise such power as well for a bad reason as for a good one, or may, without assigning any reason, peremptorily direct a foreign corporation to abandon the state. In support of this view he cited *Bank of Augusta v. Earle*, 13 Pet., 519; *Lafayette Ins. Co. v. French*, 18 How., 407; *Covington Draw Bridge Co. v. Shepherd*, 20 id., 277; *Carrol v. East St. Louis*, 67 Ill., 568; 48 id., 168; 1 Black, 297; *Paul v. Virginia*, 8 Wall., 168, 177–8, 181; 10 id., 410, 566. He also contended that the only question before the supreme court of the United States in *Home Insurance Co. v. Morse*, 20 Wall., 445, was, whether the federal court had acquired jurisdiction of that case by virtue of the attempted removal thereof, notwithstanding the agreement which the insurance company had executed. The question of the power of the state to exclude a foreign corporation was not before the court, and was not passed upon. 3. That the United States district court had no authority to restrain the secretary of state of this state from cancelling, as required by the laws of the state, a license which the state had an absolute right to grant or withhold.

*H. M. Finch*, of counsel for the respondent, contended that ch. 64 of 1872 is unconstitutional and void, 1. Because it attempts to authorize the revocation of licenses once granted for a specific period, *without notice to the corporation*. It is a universal rule, that no party shall be deprived of his rights without an opportunity to be heard. *Queen v. Saddlers' Co.*, 10 H. of L. C., 404. 2. Because the act confers *judicial* power upon the secretary of state, in violation of sec. 2, art. VII of the state constitution. It constitutes him *the sole and exclusive judge*, first, whether an application has been made by an insurance company to change the venue of any suit or action against it, from a court of this state to a federal court; and secondly, whether such application is contrary to the provisions of any law of Wisconsin or any agreement the com-

The State ex rel. Drake vs. Doyle, Secretary of State.

pany has made and filed as required by sec. 22, ch. 56 of 1870. It will readily be seen that cases might arise under the act involving the most intricate and doubtful questions of law. The entire field of the power of local agents to file applications to remove causes, or to direct their removal, might need to be explored. 3. Because the statute (sec. 22, ch. 56 of 1870) requiring foreign insurance companies to stipulate not to remove to federal courts actions commenced against them in courts of this state, is unconstitutional and void, and the agreement of the company is also illegal and void. *Home Ins. Co. v. Morse*, 20 Wallace, 445, 458. A void act of the legislature is no law; a void agreement is as no agreement; and therefore the secretary of state of this state cannot now, by virtue of the act of 1872, revoke any license for violation of the void provisions of the act of 1870, or for violation of any illegal and void agreement executed by the company under that act. Moreover (as argued by HOPKINS, J., in deciding the case of *Hartford Fire Ins. Co. v. Doyle*, in the United States district court for the western district of Wisconsin), the provisions of sec. 22, ch. 56 of 1870, and those of ch. 64 of 1872, are parts of one system of laws intended to carry out a particular policy of the state, and "all penalties, remedies and proceedings predicated upon its nonobservance would fall with the power itself." When the act of 1872 was enacted, the legislature supposed sec. 22 of the act of 1870 to be valid, and it could not have intended to annul licenses for the violation of void statutes and illegal and void agreements. 4. Because the respondent has been enjoined by the United States district court for the western district of Wisconsin from revoking this license. That court had undoubted jurisdiction of the person and subject matter of that suit. And a *mandamus* cannot legally issue to compel the performance of an act which the person to whom it is addressed has been legally enjoined from performing; and this, even though the party applying for the *mandamus* is no party to the suit

in which the injunction was granted. *Ex parte Fleming*, 4 Hill, 581; *Ohio & Ind. R. R. Co. v. Com'rs of Wyandot Co.*, 7 Ohio St., 280; *The State v. Kispert*, 21 Wis., 391. 5. Because the relator has no legal interest in the question. It appears that his claim has been settled and paid. The relator must have a real interest, special and peculiar to himself, in the performance of the duty he asks to have performed, or *mandamus* will not lie. *State v. County Com'rs*, 11 Kan., 66; *State ex rel. D'Arcy v. Judge*, 25 La. An., 621; *Com'rs etc. v. Railway Co.*, 39 Ind., 195.

A brief was also filed by the *Attorney General*, for the respondent, as follows: 1. The circuit court of the United States had jurisdiction of the bill to enjoin the secretary of state from revoking the license of the Continental Insurance Company. *Osborn v. U. S. Bank*, 9 Wheat., 739; *Davis v. Gray*, 16 Wall., 203; *Astrom v. Hammond*, 3 McLean, 107; *Darby v. Wright*, 3 Blatchf., 170. And the court whose jurisdiction first attaches, will retain it. *Wood v. Lake*, 13 Wis., 85; *Parsons v. Lyman*, 5 Blatchf., 170. 2. Where the writ will avail nothing, it will not be issued. *People v. Sup'rs of Greene*, 12 Barb., 217; *People v. Sup'rs of Westchestr*, 15 id., 607; *Col. Life Assurance Co. v. Sup'rs of New York*, 24 id., 166; *State v. Perrine*, 34 N. J., 254, and cases there cited; *State v. Waterman*, 5 Nev., 323; *People v. Monroe Oyer & Terminer*, 20 Wend., 108. Ch. 13, Laws of 1871, fixes the time when the license expires. 3. The suit with the relator having been settled, he has now no such interest in the question as entitles him to the writ. *People v. Regents, etc.*, 4 Mich., 98; *People v. State Prison*, id., 187; *Sangr v. Com'rs of Kennebec*, 25 Me., 291; *Heffner v. Comnonwealth*, 28 Pa. St., 108. Our statute has not specified the cases to which the remedy by writ may be applied, but has left it to be determined by common-law principles.

RYAN, C. J. The facts of this case were discussed at the

bar, on the motion to quash the alternative writ. But as some of them did not then appear of record, we refrained from any expression of opinion in overruling the motion. All the material facts are now before us for final adjudication.

It appears by the return that the license of the insurance company in force when these proceedings were commenced, expired by limitation pending the alternative writ; and that some three days after the motion to quash the alternative writ was denied, the respondent renewed the license for another year. His doing so, under the circumstances, may have been an act of questionable propriety. But the fact itself is immaterial here, because it was agreed by counsel, if it were otherwise doubtful, that if a peremptory writ should be granted, it should cover any subsisting license issued by the respondent to the insurance company.

The motion to quash the alternative writ was argued for the respondent by the attorney general. The demurrer to the return was argued for the respondent by the learned counsel who represented the insurance company in the federal court, and a brief was afterwards submitted on his behalf by the attorney general. Different questions were raised for the respondent by the different counsel, which will be considered in proper order.

I. It was stated by the attorney general that the suit of the relator against the insurance company had been settled; that the relator has no further interest in the question, and therefore no further right to the writ. The fact does not appear of record, but it is immaterial.

So far as the private right of the relator is concerned, it is now well settled that this court would not assume original jurisdiction to enforce it. *Attorney General v. Railroad Cos.*, 35 Wis., 425; *Attorney General v. Eau Claire*, 37 id., 400; *State v. Baker*, 38 id., 71; *State v. Supervisors*, id., 554. But, as it is said in *Attorney General v. Railroad Cos.*, " In a government like ours, public rights of the state and private

rights of citizens often meet, and may well be involved in a single litigation.    So it may be in the exercise of the original jurisdiction of the court."    "The prerogative writs can issue only at the suit of the state or the attorney general in the right of the state."    "They may go on the relation of a private person, and may involve private right."    And the question before us is not upon the private right of the relator, and is independent of the accident that there is a relator in the case. The question on which the exercise of jurisdiction here must turn, is, whether the subject matter of the writ is one "*quod ad statum reipublicæ pertinet;* one affecting the sovereignty of the state, its franchises or prerogatives." *Attorney General v. Eau Claire.*    And on this question there appears to us to be no room for doubt.

Save by the voluntary license of the state, the insurance company has no right to carry on its business within the state.    The state sees fit to grant a license to it, upon condition; instantly revocable, upon condition broken.    The insurance company breaks the condition; but claims the right, notwithstanding, to act under the license throughout the state; claims that the condition is void, and that the license is therefore independent of the condition on which it was granted. And it assumes to carry on its business throughout the state, under the license, in defiance of the condition.    Here is very plainly a direct and proximate interest of the state affecting the state at large, in some of its prerogatives, and raising "a contingency requiring the interposition of this court to preserve the prerogatives of the state, in its sovereign character." *Attorney General v. Eau Claire.*

The statute of the state devolves upon the respondent the imperative duty of revoking the license of the insurance company, upon condition broken, and prohibits a renewal of the license for three years.    The respondent claims that the statute so far is void, and wholly disregards it.    Upon condition broken, he refuses to revoke the subsisting license of the in-

surance company, and, upon its expiration, renews it. Whether the respondent be right or wrong in his view, and that is for this court and not for him to determine, it is very certain that it concerns the state at large, that one of its principal officers executes his office in positive and deliberate disregard of a public statute defining its duties.

Such a case, when presented, is one eminently calling for the exercise of our original jurisdiction; one, with or without a relator, eminently fit to be presented to the court for adjudication. The writ of *mandamus*, in such a case, eminently serves its function as a prerogative writ.

II. It was objected to the statute, by the learned counsel who argued the demurrer, that it provides for no notice to the insurance company, gives it no opportunity of being heard on the question of revocation for condition broken. It might have been more provident to have required such notice; but that rested entirely in legislative discretion. It was for the legislature alone to say whether or not the insurance company should have license to act within the state; and if so, on what conditions, and how revocable, such license should be granted. Authorizing such a license, out of its mere discretion, it was competent for the legislature to impose any conditions, reasonable or unreasonable, and to provide for revocation, upon any cause or no cause, in any manner it might see fit.

It was for the insurance company to elect whether it would seek or accept the license authorized, on the very terms on which it was offered, at its own peril of the very power of revocation reserved. And, having elected to accept the license, it cannot now set up a vested right in the license, inconsistent with the license and in defiance of the terms and conditions on which it was granted. It voluntarily ran the very risk of summary revocation, *ex parte*, to which it now objects. It took the license *cum onere*, and has no just ground of complaint that the license is not more favorable to its interests.

We have carefully examined the numerous authorities cited

The State ex rel. Drake vs. Doyle, Secretary of State.

on this point, and are unable to discover the application of any of them to the revocation of a voluntary license, in the precise manner reserved in the license itself.

III.   It was likewise urged that the duty of revocation imposed upon the secretary of state, operates to confer judicial power on that officer.

We cannot think that either the power to grant a license or the power to revoke it involves the exercise of a judicial function.   Both appear to us to be plainly and equally ministerial functions.   The secretary, upon certain facts appearing to him, is authorized to issue a license; upon certain other facts appearing to him, is required to revoke it.   This is a common condition of ministerial duty.   In such a case, the ministerial officer must exercise his personal intelligence in ascertaining the fact, upon which his authority is founded; but he acts upon his peril of the fact, and can in no sense be said to exercise a judicial function.   If the use of personal judgment in such cases should be held to be judicial, the distinction between ministerial and judicial functions would be very much removed.

The secretary of state is a ministerial officer, authorized by law to perform different duties, upon different contingencies. If he make mistakes of facts in the performance of his functions, his action may be void or voidable only, in different circumstances.   But he cannot judicially determine the facts on which he acts or refuses to act.   This can only be done by the courts, whose duty it is, in proper cases, to review his action and determine the facts and his official duty upon them.

IV. It is contended, not that the statute of the state prescribing the condition upon which license shall be granted, is a violation of the federal constitution, but that it has been so adjudged by the supreme court of the United States; and that thereupon and thereby the statute has ceased to have any force.

For the purpose, as WAITE, C. J., remarks (20 Wall., 459),

of putting foreign insurance companies licensed to do business in this state, upon an equal footing with its own companies, sec. 22 of ch. 56 of 1870 requires foreign companies, before license, to file an agreement in the secretary's office, not to remove causes against them from the state to the federal courts.

In *Morse v. Ins. Co.*, 30 Wis., 496, the insurance company had, in violation of its agreement, petitioned the state court to remove the cause from the state to the federal court, under the act of congress. This court held the agreement to be a valid relinquishment of the right of such removal, obligatory upon the insurance company, and gave judgment against it. The judgment of this court was taken by writ of error to the supreme court of the United States; and that court, in *Ins. Co. v. Morse*, 20 Wall., 445, reversed the judgment of this court, upon the ground that such an agreement did not deprive the insurance company of the right of removal to the federal court, under the constitution and laws of the United States.

The question was certainly not free from difficulty; and while we think, with all due deference, that the weight of authority and sound principle sustain the views of this court, it is our duty and pleasure to submit to the decision of the federal court, on a point unquestionably within its final jurisdiction.

Under that decision, it follows that the jurisdiction of the state court in that case was ousted, upon the presentation of the petition to remove the cause to the federal court, and that all subsequent proceedings in the state courts were *coram non judice. Gordon v. Longest*, 16 Pet., 97; *Kanouse v. Martin*, 15 How., 198; *Ins. Co. v. Dunn*, 19 Wall., 214.

The sole question, therefore, before the federal court, upon the writ of error in *Ins. Co. v. Morse*, was, whether the right of the insurance company to remove the cause to the federal court remained, notwithstanding the agreement. Upon that point only is the judgment in that case conclusive on this

court; upon that point only is the opinion of that court authoritative with this.

"This court, and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties. In *Cohens v. The State of Virginia*, 6 Wheat., 399, this court was much pressed with some portion of its opinion in the case of *Marbury v. Madison*, and Mr. Chief Justice MARSHALL said: 'It is a maxim not to be disregarded, that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent; other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.' The cases of *Ex parte Christy*, 3 How., 292, and *Jenness et al. v. Peck*, 7 id., 612, are an illustration of the rule that any opinion given here or elsewhere cannot be relied on as a binding authority, unless the case called for its expression. Its weight of reason must depend on what it contains." *Carroll v. Carroll*, 16 How., 275. The rule is elementary, but we choose to give it in the words of the court to whose opinion we consider it presently applicable.

*Ins. Co. v. Morse* was decided by a divided court. The opinion of the majority, delivered by Mr. Justice HUNT, applies to the agreement of the insurance company not to remove the cause to a federal court, the general and familiar rule, that parties cannot by contract oust the ordinary courts of their jurisdiction; citing to that effect several cases, English and American; and quoting the rule from Story's Eq., § 670, in these words: "And where the stipulation, though

not against the policy of the law, yet is an effort to divest the ordinary jurisdiction of the common tribunals of justice, such as an agreement, in case of any disputes, to refer the same to arbitrators, courts of equity will not, any more than courts of law, interfere to enforce that agreement, but they will leave the parties to their own good pleasure in regard to such agreements. The regular administration of justice might be greatly impeded or interfered with by such stipulations, if they were specifically enforced."

Having held the rule to be otherwise applicable to the agreement of the insurance company, the opinion proceeds to inquire, whether the agreement gains validity from the statute of the state requiring it; and holds that it does not, because the right of removal is given by the constitution and laws of the United States. And therefore the majority of that court reversed the judgment of this court, on the ground that the petition to remove the cause to the federal court had ousted the jurisdiction of the state court.

So far the opinion deals with the question involved in the case. Having so held, the opinion had exhausted the question before the court; had exhausted its appellate jurisdiction to this court; had exhausted its concern with the statute of the state. In its own view of the question before it, the only concern of that court with the statute of the state was, whether it could operate to take the agreement out of the general rule held to be applicable to it. The agreement was directly before the court; the statute at best was only before the court collaterally. And we may be pardoned for suggesting that, the validity of the statute not being directly involved in the decision, the declaration that it is unconstitutional overlooked the universal rule of all American courts, sanctioned by that court (*Cooper v. Telfair*, 4 Dallas, 14; *Parsons v. Bedford*, 3 Pet., 433; *United States v. Coombs*, 12 id., 72), that courts will avoid an interpretation or application of a statute rendering it unconstitutional; and will hold one so only in plain and per-

emptory cases. And with the domestic policy of the statute, with the right of the state to refuse license to insurance companies refusing to make the agreement, that court had no concern.

"This court has no authority to revise the act of [Wisconsin] upon any grounds of justice, policy, or consistency to its own constitution. These are concluded by the decision of the public authorities of the state. The only inquiry for this court is, Does the act violate the constitution of the United States, or the treaties and laws made under it?" *Carpenter v. Pennsylvania*, 17 How., 456.

The statute of the state does not assume to prohibit insurance companies taking license under it, from removing actions on its policies from state to federal courts. It only provides that no insurance company shall be licensed under it, which shall not file an agreement not to remove them. So that the question in *Insurance Co. v. Morse* was not whether the statute was in violation of the right of removal, but whether the voluntary agreement of the insurance company was obligatory upon it. The only question upon the statute before the court was, whether it could operate to give validity to the agreement, held to be otherwise invalid. And it is sufficiently plain that the validity of the agreement, and the validity of the statute requiring the agreement, are entirely distinct questions. The invalidity of the agreement has been determined by the court of last resort on the subject; but the statute remains. And we take it that no provision in the constitution, laws or treaties of the United States, is violated by a statute of the state prohibiting the license of the state to foreign corporations to do business within it, upon any condition whatever. The right of the state to refuse such license is absolute; and being absolute, it may be exercised at absolute discretion, not to be questioned or abridged, anywhere, under any pretense. It was within the appellate jurisdiction of the federal court to refuse effect to the agreement as ousting

the jurisdiction of the federal courts; but it is not within its jurisdiction to hold foreign insurance companies entitled to license without the agreement. It can hold an insurance company not bound by the agreement when made, as repugnant to the constitution and laws of the United States; but it cannot excuse the agreement as a condition precedent to license under the state statute. So far the statute stands outside of its appellate jurisdiction to this court, raising a pure question of state policy and economy, in a matter within the absolute pleasure of the state. Conceding the invalidity of the agreement, the statute still prohibits license, within the mere discretion of the state, without the agreement, and the statutory license cannot issue without it. In authorizing voluntary licenses, with absolute right to annex any condition to them, the state may exact agreements morally although not legally binding on the licensees. It may be presumed there is some sense of decency even among corporations. It may be presumed that not every insurance company will voluntarily make such an agreement, as a condition of a voluntary and advantageous license, and then deliberately violate it, even with the sanction of the supreme court of the United States. In any view, such a violation is a scandalous breach of good faith, indicating a disposition to bad faith in all the dealings of the company. And, though the agreement be not obligatory in law, yet has the state a right to trust to it, as obligatory in conscience, and to refuse licenses to all insurance companies refusing to execute it. In that view of it, the federal court has no appellate jurisdiction to this court over the statute, and the declaration that it is unconstitutional was *brutum fulmen*. To that extent at least, the state retains power over foreign corporations seeking to do business within it. The statute is indeed inoperative to give validity to the agreement, ousting the jurisdiction of the federal courts. So the supreme court of the United States has decided. But it is operative to prescribe the conditions on which the state, in the exercise of its sovereign au-

thority, sees fit to license foreign corporations within it. That is for this court, not that, to determine. No foreign insurance company need come here under the agreement; coming, every foreign insurance company violating the agreement is guilty of a moral fraud upon the state. And, in upholding the statute to this extent, against the extrajudicial *dictum* of the supreme court of the United States, we may quote in our own behalf the language of one of the great chief justices of that court: "A sanction is claimed to a breach of trust, and a violation of moral principle. In such a case, the mind submits reluctantly to the rule of law, and laboriously searches for something which shall reconcile that rule with what would seem to be the dictate of abstract justice." *Hannay v. Eve*, 3 Cranch, 242.

The provision in sec. 22 of ch. 56 of 1870, requiring the agreement as a condition of license, was alone before the court in *Insurance Co. v. Morse*. And so far we have considered it by itself. But this writ is applied for, not under that section, but under ch. 64 of 1872. And the two statutes taken together put the whole subject in a view which was not before the court in that case, and could not properly be in any case of its appellate jurisdiction to a state court. The former statute requires the agreement; the latter statute provides for the revocation of any license issued, upon violation of the agreement. And, the agreement being invalid to oust the jurisdiction of the federal courts, the two provisions together are equivalent to one requiring the revocation of a license issued to a foreign insurance company upon its application to remove an action on its policy from a state to a federal court.

The statute extended to these foreign insurance companies the privilege of doing business in this state on equal footing with domestic companies. Experience showed their power to harass the citizens of the state doing business with them, by removing actions on their policies from courts of the vicinage

to distant and expensive tribunals. Hence the provisions of both statutes. And, conceding to the fullest extent the right of removal of actions commenced, we can see no pretense for questioning the power of the state, in the exercise of its absolute discretion on the subject, to revoke the license of a company exercising the right. The state has power to make its voluntary license subject to forbearance of a right, and revocable upon its exercise. The right may survive the license, but the license cannot survive its exercise. So grants are sometimes made upon condition to forbear a right. It was for the authorities of the state alone to judge that the exercise of the right is an abuse of the privilege of the license. With that question federal courts have no concern. They can hold, as they have, that the right exists in pending actions, but they have no jurisdiction over the question whether foreign corporations, exercising the right, shall be permitted by the state to do business within it. That is matter of state policy, state law, state jurisdiction.

The distinction between the validity of the agreement, and the validity of the statute, is readily illustrated. It is quite clear that the secretary of state takes no authority, under the statute, to license a foreign insurance company not executing the agreement. That is a condition precedent to his authority. This court would assuredly refuse to compel him to act in disregard of the statute which confers his authority. And we take it that the supreme court of the United States would hardly claim appellate jurisdiction to review our decision, or to compel a state officer to act officially for the state, in disregard of the letter of his authority, on the ground that the agreement, when executed, is inoperative to oust the jurisdiction of the federal court.

We have hitherto considered the agreement in the light in which it is held by the opinion in *Ins. Co. v. Morse.* But, with great deference, we are unable to consider the construction of the agreement there expressed to be correct, even with-

in the views of the court itself. It is held to be repugnant to the constitution and laws of the United States. But an agreement not to remove a cause from a state to a federal court, though it will not be enforced as obligatory against removal, does not appear to be in itself repugnant to any law. The party may keep it in good faith, without offense against the law. Courts will not indeed enforce it; but, in the language of Judge STORY, leave the parties to their own good pleasure in regard to it. Had the insurance company, in that case, complied with the agreement and not removed the cause, it would have been guilty of no violation of the constitution or laws of the United States. In the view taken of it by the supreme court, it is ineffectual but not illegal. We have seen no case holding such an agreement illegal, though it has been sometimes called nugatory. In the leading case of *Kill v. Hollister*, 1 Wilson, 129, it was held that an agreement to arbitrate did not bar the action, because there had been no submission under it; the court intimating that a submission under it would have been a bar. And it has been held that, though such an agreement will not defeat an action brought under it, yet an action will lie on it for breach of it. *Livingston v. Ralli*, 5 Ellis & Bl., 132. See also *Nute v. Ins. Co.*, 6 Gray, 174; *Hobbs v. Ins. Co.*, 56 Me., 417.

It appears to us to be very plain that the statute of 1870 is a valid enactment; that its validity was not involved in the decision of *Ins. Co. v. Morse;* that its validity, as a limitation upon the issue of licenses under state authority, was not within the appellate jurisdiction of the court; and that the declaration in the opinion that it is repugnant to the constitution and laws of the United States and therefore void, is but an improvident and erroneous expression of the learned judge who delivered the opinion. With all due deference, we may be permitted to say of it what Lord MANSFIELD said of a *dictum* of Chief Justice HOLT: "That is an *obiter* saying only; and not a resolution or determination of the court, or a direct

solemn opinion of the great judge from whom it dropped."
*Saunderson v. Rowles*, 4 Burr., 2064.

The opinion proceeds to discuss the relations of foreign cor-
porations to the state, in a scope wholly foreign to the judg-
ment in the case, and in a tone inconsistent with decided cases
in that court; and therefore, so far, of no authority there or
here.    It is sufficient for this case that that great tribunal has
frequently and uniformly held that the corporations of one
state have no right to migrate to another, there to exercise
their franchises, except upon the assent of such other state;
and that such assent may be granted upon such terms and
conditions as the state granting it may think proper to im-
pose.    *Ins. Co. v. French*, 18 How., 404; *Paul v. Virginia*,
8 Wall., 168; *Ducat v. Chicago*, 18 id., 410; *Ins. Co. v. Mas-
sachusetts*, id., 566; *Osborn v. Mobile*, 16 id., 479.

*Paul v. Virginia* was the case of an insurance company of
New York, doing business in Virginia, under a statute of the
latter state prohibiting foreign insurance companies from
doing business there without license to be granted upon con-
ditions precedent.    It was decided as late as 1868.    And the
court uses this language:

"The corporation, being the mere creation of local law, can
have no legal existence beyond the limits of the sovereignty
where created.    As said by this court in *Bank of Augusta v.
Earle*, 'It must dwell in the place of its creation, and can-
not migrate to another sovereignty.'    The recognition of its
existence even by other states, and the enforcement of its con-
tracts made therein, depend purely upon the comity of those
states — a comity which is never extended where the existence
of the corporation or the exercise of its powers are prejudicial
to their interests or repugnant to their policy.    Having no
absolute right of recognition in other states, but depending
for such recognition and the enforcement of its contracts upon
their assent, it follows, as a matter of course, that such assent
may be granted upon such terms and conditions as those states

may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities; or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion." And this doctrine is expressly affirmed in *Ducat v. Chicago*, a like case in 1870.

The doctrine is so sound in itself, and so many of the decisions of that court on other subjects would be disturbed or subverted by a departure from it, that we feel safe in holding it to be the settled law of the federal supreme court, notwithstanding intimations to the contrary in the opinion in *Ins. Co. v. Morse;* another reason for regarding these as not sufficiently considered, as is apt to be the case with all *obiter dicta*.

V. But if we should be mistaken in all this, if the provision of the statute of 1870 requiring the agreement, be unconstitutional, there is another view of the case in our judgment conclusive of it.

*Morse v. Ins. Co.* was decided in 1874, and reported in 1875. The legislature of the state has since been in session. And there is no doubt that their attention was called to the decision. Yet, though they have since enacted at least one statute, ch. 300 of 1876, amending the general insurance laws, they have not repealed or modified the provision requiring the agreement. This is a strong confirmation of our view, derived from the statute itself and its history, that the legislature would not have adopted or retained the statute authorizing licenses to foreign insurance companies, without the provision for the agreement. It is not an independent provision, to fall by itself. The other provisions of the statute in regard to license cannot be executed independently of it. It was evidently designed as a compensation for the provisions authorizing licenses, an inducement to them. And it is the settled doctrine of this court that, if it be unconstitutional, the whole statute authorizing licenses to foreign insurance companies is

unconstitutional. *Slauson v. Racine,* 13 Wis., 398; *Lynch v. The "Economy,"* 27 id., 69; *State v. Dousman,* 28 id., 541.

In that view of the statute, no license to foreign insurance companies would be authorized by law; the secretary of state would have acted without color of authority in issuing the license in question; the license would give no color of right to the insurance company to do business within the state; and it would be our undoubted duty to compel the secretary to undo an official act, done without authority, an infringement upon the prerogatives of the state, and a usurpation of the sovereign authority.

VI. The return pleads in bar of the peremptory writ, an injunction of the circuit court of the United States for the western district of Wisconsin, issued upon a bill filed in that court by the insurance company against the secretary of state, restraining that officer from revoking the license of the state to the insurance company. And the brief of the attorney general takes the position, that the federal court had jurisdiction of the bill, and that jurisdiction of the subject matter having first attached in that court, the jurisdiction of that court is exclusive of the jurisdiction of this.

Upon the application to us for the alternative writ, the learned counsel for the relator made a statement, repeated on both arguments without contradiction, which has left a very painful impression on our minds. He stated that as early as July, 1875, the petition for the alternative writ was filed, and the writ issued, and we think served, in one of the circuit courts of this state; and that, upon the suggestion of the attorney general in September, that the petition should, for convenience, be withdrawn from that court and immediately filed in this, the relator's counsel assented, withdrew the petition from the circuit court, and sent it to the attorney general to be at once filed in this court according to the suggestion; that the relator's counsel understood it to be so filed

here, and the alternative writ issued; that it was not so filed; but that in the meantime the proceeding was taken and the injunction issued in the federal court, of which the relator's counsel had no notice. It does not appear by the record of the proceeding annexed to the return, that the secretary of state or the attorney general appeared in the federal court or made any objection to the injunction. Indeed, the record implies that there was no such appearance or objection. As the facts, except perhaps the last, do not appear of record, we are without power to act upon them; but, if they are correctly stated, the present objection to our jurisdiction to issue the writ, appears to us to come with an ill grace from the chief law officer of the state. For it would be a grave encroachment upon the sovereign authority of the state, if state officers could so transfer judicial control over their official action for the state, and the prerogative jurisdiction of this court, to an inferior federal court. But it is quite certain that the federal court has not jurisdiction to bind the state, or to foreclose the authority of the state courts, on behalf of the state, over its own officers, in their duty to it, under its own laws.

As originally adopted, the federal constitution extended the judicial power of the United States to controversies " between a state and citizens of another state," vesting in the supreme court of the United States original jurisdiction in all cases " in which a state shall be a party." This grant of original jurisdiction, in such cases, to that great court, appears to have been considered exclusive. Federalist No. 80; Story's Const., § 1682; 1 Kent, 298; *Georgia v. Brailsford*, 2 Dallas, 415; *Cohens v. Virginia*, 6 Wheat., 264.

The jurisdiction was probably intended to apply only to cases in which a state should be plaintiff. But it was held to embrace all controversies between states, whether plaintiffs or defendants, and citizens of other states, so far reducing a sovereign state to the condition of a private corporation. *Chisholm v. Georgia*, 2 Dallas, 419. This was probably a

surprise, certainly an offense, to most — if not all — of the states. Says Chancellor KENT:

"The judicial power, as it originally stood, extended to suits prosecuted *against* one of the United States by citizens of another state, or by citizens or subjects of any foreign state; but the states were not willing to submit to be arraigned as defendants before the federal courts at the instance of private persons, be the cause of action what it might. The decision of the supreme court of the United States in the case of *Chisholm v. The State of Georgia*, decided in 1793, in which it was adjudged that a state was suable by citizens of another state, gave much dissatisfaction, and the legislature of Georgia carried their opposition to open defiance of the judicial authority. The inexpediency of the power appeared so great, that congress, in 1794, proposed to the states an amendment to that part of the constitution, and it was subsequently amended in this particular, under the provision in the fifth article." 1 Kent, 296.

The amendment is in these words: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

The manifest object of the amendment was to preclude the federal courts from jurisdiction over a state, in any case, at the suit of private parties. And by all rules of construction, the prohibition should apply to all cases in which the interest of a state is so concerned that it ought otherwise to be a party. But the intent and letter of the amendment have been greatly narrowed by the effect given to it by the decisions of the supreme court of the United States.

The constitution designed that court to be, as it is, a great national tribunal; a court of last resort on all questions of national character; and a court of dignity and authority unequaled by any tribunal known in modern history, not,

perhaps, excepting the imperial chamber at Wetzlar, to which it has been compared. Federalist No. 80; Story's Const., § 1679; 1 Kent, 296. And yet, that august tribunal has no general jurisdiction, but is essentially a court of defined and limited jurisdiction, original and appellate. We speak with profound deference to that court, in saying that it should be matter of surprise to no jurist, to no student of history, that so august a tribunal, so constituted and limited, should have from the beginning proved impatient of the limited scope of its own authority, and that of the inferior federal courts on which its own jurisdiction chiefly rests; gradually and sometimes almost insensibly extending it, and signally illustrating the maxim, *ampliare jurisdictionem*. Its views of federal jurisdiction have always been aggressive. · It has but illustrated a general human tendency, a common phase of judicial history, in gradually enlarging the letter of its jurisdiction by construction, until its jurisdiction by implication appears to exceed its jurisdiction by express grant; until it appears to be loaded down and impeded, we might almost say overwhelmed, by excess of jurisdiction, presumably never contemplated by the framers of the constitution.

And it was, perhaps, hardly to be expected that an amendment to the constitution, abolishing a jurisdiction originally granted by that instrument to federal courts, would be kindly regarded by so great a court so constituted, or favorably construed for the prohibition and against the jurisdiction. So it has surely proved.

The amendment appears to have been first before the court in *Hollingsworth v. Virginia*, 3 Dall., 378. The question was, the effect of the amendment upon pending suits. And the court " delivered an unanimous opinion, that, the amendment being constitionally adopted, there could not be exercised any jurisdiction in any case, past or future, in which a state was sued by the citizens of another state, or by citizens or subjects of any foreign state." But a few years later, in a cause

in which a state claimed an interest but was not a party, the court used this language:

"The right of a state to assert, as plaintiff, any interest it may have in a subject which forms the matter of controversy between individuals in one of the courts of the United States, is not affected by this amendment; nor can it be so construed as to oust the court of its jurisdiction, should such claim be suggested. The amendment simply provides, that no suit shall be commenced or prosecuted against a state. The state cannot be made a defendant in a suit brought by an individual; but it remains the duty of the courts of the United States to decide all cases brought before them by citizens of one state against citizens of a different state, where a state is not necessarily a defendant. In this case, the suit was not instituted against the state or its treasurer, but against the executrixes of David Rittenhouse, for the proceeds of a vessel condemned in the court of admiralty, which were admitted to be in their possession. If the proceeds had been the actual property of Pennsylvania, however wrongfully acquired, the disclosure of that fact would have presented a case on which it was unnecessary to give an opinion; but it certainly can never be alleged, that a mere suggestion of title in a state to property, in possession of an individual, must arrest the proceedings of the court, and prevent their looking into the suggestion, and examining the validity of the title." *United States v. Peters*, 5 Cranch, 115. It will be presently seen that the suggestion here thrown out is the seed of great growth of jurisdiction, inconsistent with the spirit of the amendment, if not with its letter.

The amendment appears to have next come before the court in *Cohens v. Virginia*, 6 Wheat., 264. The state had prosecuted the plaintiffs in error criminally in one of her courts, and there was judgment of conviction against them. They sued out a writ of error from the federal supreme court to the state court, against the state; the state being defendant in

error in that court. Notwithstanding the amendment, the court claimed jurisdiction of the cause, upon the ground that such a proceeding was not a suit within the meaning of the amendment, though it subjected the state to a judgment in that court, at the suit of a private party. And the court has hitherto adhered to that rule in numerous cases.

In *Osborn v. U. S. Bank*, 9 Wheat., 738, the court thus states the question: " The direct interest of the state in the suit, as brought, is admitted; and, had it been in the power of the bank to make it a party, perhaps no decree ought to have been pronounced in the cause, until the state was before the court. But this was not in the power of the bank.   The eleventh amendment of the constitution has exempted a state from the suit of citizens of other states or aliens; and the very difficult question is to be decided, whether, in such a case, the court may act upon the agents employed by the state, and on the property in their hands." And the court thus states its conclusion: " It may, we think, be laid down as a rule which admits of no exception, that in all cases where jurisdiction depends on the party, it is the party named in the record.   Consequently, the eleventh amendment, which re-strains the jurisdiction granted by the constitution over suits against states, is, of necessity, limited to those suits in which a state is a party on the record. The amendment has its full effect, if the constitution be construed as it would have been construed had the jurisdiction of the court never been extend-ed to suits brought against a state by the citizens of another state, or by aliens.   The state not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is, not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties." The court then proceeds to show that the officers of the state, who were the parties to the record, were personally

liable to the bank, and therefore had a real, personal interest, under the state indeed, but distinct from the interest of the state; and upon that ground upheld the decree against them.

This is the leading case upon the subject. And it is very distinguishable from the case before us, in which the secretary of state has no interest whatever; is a mere nominal party, the state alone having the whole interest in the subject; a mere shadow of the state, set up for jurisdiction against the body, over which jurisdiction is prohibited by the constitution.

The next case which we find is *Governor of Georgia v. Madrazo*, 1 Pet., 110. That was a case in admiralty, in which the governor of the state intervened in behalf of the state. And the court uses this language:

"Previous to the adoption of the 11th amendment to the constitution, it was determined that the judicial power of the United States extended to a case in which a state was a party defendant. This principle was settled in the case of *Chisholm v. Georgia*, 2 Dal., 419. In that case, the state appears to have been nominally a party on the record. In the case of *Hollingsworth v. Virginia*, also, in 3 Dal., 378, the state was nominally a party on the record. In the case of *Georgia v. Brailsford*, 2 Dal., 402, the bill was filed by his excellency Edward Telfair, Esq., governor and commander-in-chief in and over the state of Georgia, in behalf of the said state. No objection was made to the jurisdiction of the court, and the case was considered as one in which the supreme court had original jurisdiction, because a state was a party. In the case of *New York v. Connecticut*, 4 Dal., 3, both states were nominally parties on the record. No question was raised in any of the cases respecting the style in which a state should sue or be sued; and the presumption is that the actions were admitted to be properly brought. In the case of *Georgia v. Brailsford*, the action is not in the name of the state, but it is brought by its chief magistrate in behalf of the state. The bill itself avows that the state is the actor, by its governor.

" There is, however, no case in which a state has been sued without making it nominally a defendant.

" *Fowler et al. v. Lindsey et al.*, 3 Dal., 411, was a case in which an attempt was made to restrain proceedings in a cause depending in a circuit court; on the allegation that a controversy respecting soil and jurisdiction of two states had occurred in it.

" The court determined that, a state not being a party on the record, nor directly interested, the circuit court ought to proceed in it. In the *United States v. Peters*, the court laid down the principle, that although the claims of a state may be ultimately affected by the decision of a cause, yet if the state be not necessarily a defendant, the courts of the United States are bound to exercise jurisdiction.

" In the case of *Osborn v. The Bank of the United States*, 9 Wheat., 738, this question was brought more directly before the court. It was argued with equal zeal and talent, and decided on great deliberation. In that case, the auditor and treasurer of the state were defendants, and the title of the state itself to the subject in contest was asserted. In that case, the court said: ' It may, we think, be laid down as a rule which admits of no exception, that in all cases where jurisdiction depends on the party, it is the party named in the record.' The court added: ' The state not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties.'

" The information of the governor of Georgia professes to be filed on behalf of the state, and is in the language of the bill filed by the governor of Georgia on behalf of the state against Brailsford.

" If, therefore, the state was properly considered as a party in that case, it may be considered as a party in this.

" The bill of Madrazo alleges that the slaves which he claims, ' were delivered over to the government of the state of Georgia, pursuant to an act of the general assembly of the said state, carrying into effect an act of congress of the United States, in that case made and provided; a part of the said slaves sold, as permitted by said act of congress, and as directed by an act of the general assembly of the said state; and the proceeds paid into the treasury of the said state, amounting to thirty-eight thousand dollars or more.'

" The governor appears, and files a claim on behalf of the state, to the slaves remaining unsold, and to the proceeds of those which are sold. He states the slaves to be in possession of the executive, under the act of the legislature of Georgia, made to give effect to the act of congress on the subject of negroes, mulattoes or people of color, brought illegally into the United States; and the proceeds of those sold to have been paid in the treasury, and to be no longer under his control.

" The case made, in both the libel and claim, exhibits a demand for money actually in the treasury of the state, mixed up with its general funds, and for slaves in possession of the government. It is not alleged, nor is it the fact, that this money has been brought into the treasury, or these Africans into the possession of the executive, by any violation of an act of congress. The possession has been acquired by means which it was lawful to employ.

" The claim upon the governor is as a governor; he is sued not by his name, but by his title. The demand made upon him, is not made personally, but officially. The decree is pronounced not against the person, but the officer, and appeared to have been pronounced against the successor of the original defendant; as the appeal bond was executed by a different governor from him who filed the information. In such a case,

where the chief magistrate of a state is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think the state itself may be considered as a party on the record. If the state is not a party, there is no party against whom a decree can be made. No person in his natural capacity is brought before the court as defendant. This not being a proceeding against the thing, but against the person, a person capable of appearing as defendant, against whom a decree can be pronounced, must be a party to the cause before a .decree can be regularly pronounced.

"But were it to be admitted that the governor could be considered as a defendant in his personal character, no case is made which justifies a decree against him personally. He has acted in obedience to a law of the state, made for the purpose of giving effect to an act of congress; and has done nothing in violation of any law of the United States.

"The decree is not to be considered as made in a case in which the governor was a defendant in his personal character; nor could a decree against him in that character be supported.

"This decree cannot be sustained as against the state, because, if the 11th amendment to the constitution does not extend to proceedings in admiralty, it was a case for the original jurisdiction of the supreme court. It cannot be sustained as a suit prosecuted not against the state, but against the thing; because the thing was not in possession of the district court.

"We are therefore of opinion that there is error in so much of the decree of the circuit court as directs that the said slaves libelled by Juan Madrazo, and the issue of the females now in the custody of the government of the state of Georgia, or the agent or agents of the said state, be restored to the said Madrazo, as the legal proprietor thereof, and that the proceeds of those slaves who were sold by order of the governor or the said state, be paid to the said Juan Madrazo; and that the same ought to be reversed; but that there is no error in so

much of the decree as dismisses the information of the governor of Georgia, and the claim of William Bowen."

*Governor of Georgia v. Madrazo* was followed and affirmed in *Kentucky v. Dennison, Governor*, 24 How., 66. This was an application for *mandamus*, by the governor of Kentucky, against the governor of Ohio, within the original jurisdiction of the supreme court, to enforce the performance of an executive duty by the defendant governor. Of course, the *mandamus* could not go to the state, but to its officers only. And the objection was taken that it was not a case between two states, to give jurisdiction to the court under the constitution. But the court holds:

" So, also, as to the process in the name of the governor, in his official capacity, in behalf of the state.

" In the case of *Madrazo v. The Governor of Georgia*, 1 Pet., 110, it was decided, that in a case where the chief magistrate of a state is sued, not by his name as an individual, but by his style of office, and the claim made upon him is entirely in his official character, the state itself may be considered a party on the record. This was a case where the state was the defendant; the practice, where it is plaintiff, has been frequently adopted, of suing in the name of the governor in behalf of the state, and was indeed the form originally used, and always recognized as the suit of the state.

" Thus, in the first case to be found in our reports, in which a suit was brought by a state, it was entitled, and set forth in the bill, as the suit of 'The state of Georgia, by Edward Telfair, Governor of the said state, complainant, against Samuel Brailsford and others;' and the second case, which was as early as 1793, was entitled and set forth in the pleadings as the suit of 'His Excellency Edward Telfair, Esquire, Governor and Commander-in-Chief, in and over the state of Georgia, in behalf of the said state, complainant, against Samuel Brailsford and others, defendants.'

VOL. XL. — 14

" The cases referred to leave no question open to controversy as to the jurisdiction of the court. They show that ........it has also been settled, that where the state is a party, plaintiff or defendant, the governor represents the state, and the suit may be, in form, a suit by him as governor in behalf of the state, where the state is plaintiff, and he must be summoned or notified as the officer representing the state, where the state is defendant.

"We may therefore dismiss the question of jurisdiction without further comment; and it is very clear, that if the right claimed by Kentucky can be enforced by judicial process, the proceeding by mandamus is the only mode in which the object can be accomplished."

What is said in *Governor of Georgia v. Madrazo*, and in *Kentucky v. Dennison*, of the governor of a state, applies equally to any other state officer, acting for the state, *virtute officii*. The question is not one of the dignity of the office, but of the representation of the state *pro hac vice*. "In the application of this principle, there is no difference between the governor of a state and officers of a state of lower grades. In this respect they are upon a footing of equality." *Davis v. Gray*, 16 Wall., 203.

The opinions of the court in *Osborn v. The Bank*, and *Governor of Georgia v. Madrazo*, were both delivered by MARSHALL, C. J.; and the opinion in *Kentucky v. Dennison*, by TANEY, C. J.; two of the most illustrious jurists known in the history of jurisprudence among the great English speaking, common law peoples. Their doctrines were surely well and wisely considered, are entitled to the most profound deference, and not lightly to be overruled. And these cases are in entire accord upon two propositions, both conclusive of the question before us:

1. That where a suit is prosecuted in a federal court, by a private party, against a state officer, in which the state has a direct interest but cannot be made a party, the officer himself

must have an interest or liability in the subject matter, upon which the jurisdiction of the court can attach; and,

2. That where such a suit is prosecuted against a state officer having no such interest or liability, in his official capacity only, to affect a right of the state, the state is the real defendant, within the prohibition of the amendment of the constitution.

These rules are vital. Where there is such an interest or liability of the officer personally, the jurisdiction of a federal court might be held to attach against him personally, upon such interest or liability, without direct violation of the constitutional amendment prohibiting jurisdiction against the state. But where there is no such personal interest or liability of the officer, and the suit is against him in his official capacity only, for the purpose of reaching an interest or liability of the state, then jurisdiction attaches on the interest or liability of the state, not of the officer; the state is the real defendant, and the officer only a nominal defendant; and jurisdiction is as much prohibited as if the state itself were defendant. To hold that jurisdiction could, in such a case, be exercised against the state, in the person of its officer, would be a direct and mere evasion of the constitutional prohibition, which the judges of all courts, federal and state, are sworn to support; which no judicial construction of any court can erase from the paramount law of the land.

The subject matter of *Governor of Georgia v. Madrazo* came again before the court, *ex parte Juan Madrazo*, 7 Pet., 627, upon application to file a libel in admiralty against the state. The application was denied; the chief justice saying of it: " It is a mere personal suit against a state to recover proceeds in its possession, and in such a case no private person has a right to commence an original suit in this court against a state."

*Osborn v. The Bank*, *Governor of Georgia v. Madrazo*, and *Kentucky v. Dennison*, are so closely connected in prin-

ciple that we have considered them together, a little out of the order of the latter case. Between *Governor of Georgia v. Madrazo* and *Kentucky v. Dennison,* another case came before the court and has its place in the reports, in which the jurisdictional question might have properly arisen. This is *Dodge v. Woolsey,* 18 How., 331. It was the case of a bill filed in an inferior federal court, by a private party, against a tax collector of the state, to restrain the collection of a state tax. Several questions were raised and passed upon by the court in that case, quite foreign to the question which we are considering. The jurisdictional question before us, arising under the amendment of the constitution, appears not to have been raised at the bar or considered by the court. The jurisdiction of the federal courts over the subject matter in other respects is discussed, but not the jurisdiction over the state officer acting officially, without interest, within the constitutional prohibition. It appears quite obvious that this question was altogether overlooked. Indeed the court says of the case of *State Bank v. Knoop,* 16 How., 369: "It rules this in every particular, and to the opinion there given we have nothing to add, nor anything to take away." *State Bank v. Knoop* did indeed involve the questions passed upon in *Dodge v. Woolsey;* but it was a writ of error to a state court, and could not possibly involve the jurisdiction of a federal court, in an original suit against a state officer acting officially. The oversight is the more to be regretted, because the assumption of jurisdiction in *Dodge v. Woolsey* disregards the two conditions before noticed, as solemnly established in *Osborn v. The Bank* and *Governor of Georgia v. Madrazo,* subsequently confirmed in *Kentucky v. Dennison.* But the rule applies to it, that a case which overlooks a point cannot be held to overrule cases expressly deciding the very point. And the positive rules of *Osborn v. The Bank,* and *Governor of Georgia v. Madrazo,* must be held to survive the silence of *Dodge v. Woolsey.* If this were otherwise, the

The State ex rel. Drake vs. Doyle, Secretary of State.

negative authority of *Dodge v. Woolsey*, on the question of jurisdiction, must be taken to be overruled by the positive authority of the later case of *Kentucky v. Dennison*.

Then comes *Davis v. Gray*, 16 Wall., 203, where a receiver appointed in a cause pending in an inferior federal court filed his bill in the same court against the governor and another officer of a state, to restrain them in executing the law of the state. The question of jurisdiction was raised and discussed by the court. And Mr. Justice SWAYNE, who delivered the opinion, says of the question:

" A few remarks will be sufficient to dispose of the jurisdictional objections as to the appellants.

" In *Osborn v. The Bank of the United States*, three things, among others, were decided:

" (1) A circuit court of the United States, in a proper case in equity, may enjoin a state officer from executing a state law in conflict with the constitution or a statute of the United States, when such execution will violate the rights of the complainant.

" (2) Where the state is concerned, the state should be made a party, if it could be done. That it cannot be done is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the state in all respects as if the state were a party to the record.

" (3) In deciding who are parties to the suit, the court will not look beyond the record. Making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind him as the real party in interest. A state can be made a party only by shaping a bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case.

" *Dodge v. Woolsey, The State Bank of Ohio v. Knoop, The Jefferson Branch Bank v. Skelly, Ohio Life and Trust Company v. Debolt* and *The Mechanics' and Traders' Bank*

*v. Debolt* proceeded upon the same principles, and were controlled by that authority, with respect to the jurisdictional question arising in each of those cases as to the defendant."

And again, speaking of parties: "We feel no difficulty in disposing of the case as it is presented in the record."

This case professes to follow *Osborn v. The Bank;* but it is extraordinary that it takes no notice of the essential rule cited from that case, that defendant state officers, to give jurisdiction, must themselves have an interest or liability in the subject matter. And it is more extraordinary still that, quoting several cases with at best a very remote bearing on the question, the opinion makes no reference to *Governor of Georgia v. Madrazo* or *Kentucky v. Dennison;* with both of which the opinion is directly in conflict, as well as with the rule in *Osborn v. The Bank.* And with all due respect, we think it may be said of *Davis v. Gray,* that, instead of following the well considered and established rules in *Osborn v. The Bank, Governor of Georgia v. Madrazo* and *Kentucky v. Dennison,* it rather follows, presumably by inadvertence, the blind lead of *Dodge v. Woolsey,* itself an ·incongruity, sandwiched in the reports between inconsistent decisions.

We cannot think the vital principle established in *Osborn v. The Bank,* or the judgments in *Governor of Georgia v. Madrazo* and *Kentucky v. Dennison,* overruled by *Davis v. Gray.* These cases are too solemn and of too high authority to be set aside *sub silentio.* We cannot but think that they were overlooked; the learned judge who delivered the opinion being misled by the unconsidered and unfortunate departure from those cases of *Dodge v. Woolsey.*

*Woodruff v. Trapnall,* 10 How., 190; *Curran v. The State of Arkansas,* 15 id., 304; *State Bank v. Knoop,* 16 id., 369; *Ohio Life Ins. and Trust Co. v. Debolt,* id., 416; *The Bank v. Debolt,* 18 id., 380, and *The Bank v. Skelly,* 1 Black, 436, cited·in the opinion to support jurisdiction in *Davis v. Gray,* were all writs of error to state courts, to be classed with

*Cohens v. Virginia.* And their authority for original juris-diction in an inferior federal court is not perceived. And it may be said, in passing, that the learned judge who delivered the opinion was in error in saying that in *Woodruff v. Trap-nall* a writ of *mandamus* was issued to the proper repre-sentative of the state. The judgment of the supreme court of the state was simply reversed in the usual form. So in *Curran v. Arkansas* the judgment of the state court was re-versed; the federal supreme court simply following the state supreme court in holding that such a suit would lie against the state, by her own law, in her own courts.

When the decisions of a state court vary in interpreting state law, the supreme court of the United States makes its own election which it will follow. *Gelpcke v. Dubuque,* 1 Wall., 175. We may, with profound respect, presume here upon the like right of choice; and we prefer to hold the rules in *Osborn v. The Bank, Governor of Georgia v. Madrazo* and *Kentucky v. Dennison,* as the more authoritative and well considered cases to settle the law of that court, unless ex-pressly overruled. When adjudications so solemn and so well considered are disregarded or forgotten in the court, none of us may presume to say, *Indignor;* but surely all of us should recall sounder and safer principles established in that great court. *Quandoque bonus dormitat Homerus.*

And the rules established in *Osborn v. The Bank, Governor of Georgia v. Madrazo* and *Kentucky v. Dennison,* exclude jurisdiction of the federal court of the bill and injunction pleaded by the secretary of state in this case.

Our conclusion would not be different, if we were to accept *Davis v. Gray* as overruling the earlier cases, and establishing a different rule. For that case does not go the length — no case which we have been able to find in that court does — of holding that the state would be bound in the exercise of its authority by the proceeding in the federal court against its officer. Conceding the power of the federal court to bind the officer,

as between him and the plaintiff who sues him, the constitutional amendment absolutely prohibits it from binding the state, as against either the plaintiff or its own officer. In such a case the private party seeking his remedy against the officer, must be content with that, *valeat quantum.* He can have none against the state, or binding the state, or binding the officer against the state. Against the authority of the state over its own officer, against the officer's duty to the state, federal process in such a case can avail nothing. It is more than the case of one not bound by a judgment, because not a party. It is not the case of one without the jurisdiction of the court, but of one above the jurisdiction. It is the case of a sovereign state, over which the charter creating the federal courts, for grave political reasons, prohibits jurisdiction in such cases; has abrogated the jurisdiction once improvidently granted. It would be a singular perversion of all judicial rule, to hold that the state could not be bound as a party, but is bound without being a party. And it would be a simple nullification of the constitutional amendment, to hold the state in any way bound by the judgment of a federal court against its officer, at the suit of a private party. That would be, not judicial construction, not judicial stretch of jurisdiction, but judicial revolution.

And it would involve the singular absurdity, that, while the original constitution, which expressly gave jurisdiction, at the suit of private parties, against a sovereign state, confined such jurisdiction to the supreme court of the United States, a court worthy of such jurisdiction, if any federal court could be, the amendment prohibiting such jurisdiction in any federal court would subject a sovereign state, in the person of its officer, and the administration of the state government, to the process of any petty federal court which congress might see fit to establish, at the suit of any vagabond citizen or corporation of another state doing business in it.

We abide by the letter and spirit of the constitution. Unfor-

tunately many things in its administration are tending toward centralization, which the history and temper of the American people give grave warning might be closely followed by disintegration. The integrity of the union has been tried. The integrity of the states is on trial. Much rests upon the moderation and forbearance of the federal courts; as much perhaps upon the firmness of the state courts, refusing to abdicate state authority, in state matters, to assumption of federal jurisdiction. We will faithfully try to do our part. In refusing at the last term to assume a jurisdiction properly belonging to the federal courts, we had occasion to say, and we now repeat: "It is perhaps unfortunate that the federal constitution left any ground for concurrent jurisdiction of the federal with the state courts. It has led to some mischievous confusion of adjudication, and some vicious usurpation of jurisdiction, by both federal and state courts. In this day, this is a great and growing evil. And we propose, in this state, for the sake of judicial order, and of the integrity of the federal and state governments, to do what we may towards confining the courts of the state to state jurisdiction, and the courts of the United States to federal jurisdiction." *Bromley v. Goodrich, ante,* p. 131.

VII. Had the federal court had jurisdiction of the bill and injunction pleaded by the secretary, to bind the state, it could not avail him in this case. Because the license in force when the bill was filed and the injunction issued, has expired by its own limitation. And it is only to that license that the injunction can relate. The injunction is indeed very loose and general; literally broad enough to restrain the secretary from revoking any license to the insurance company, for any cause, for all time. But it must receive a reasonable construction, and be confined to the things and the condition of things existing when issued. When the license existing at the time the bill was filed, expired, the injunction was spent. The secretary might have found ground for refusing a new license, *dehors* all matters pleaded in the bill; or the legislature might

have repealed or modified the statute authorizing the license. The new license, therefore, created a new relation with the state, though it may have been but the renewal of an old relation which had expired by limitation. And the federal court which issued the injunction could hardly have intended, certainly had, in any view, no authority to bind the defendant for all time, outside of the actual condition of things pleaded in the record, or in new relations between the parties. Even federal jurisdiction, where it attaches, is not so comprehensive or prospective.

VIII. The writ in this case will issue in the right of the state, at any hazard to its officer. We apprehend, however, that there will be none. The state officer is bound to obey the state authority. And if any one, to be found within the state, should molest any officer of the state for obeying the process of this court, in the administration of the state government, and the fact should be properly brought before us, we think we should be able to afford ample and summary remedy.

We regard this matter as a grave attempt to baffle state authority in the administration of state affairs, in a way to be a temptation for the use of a somewhat unjudicial adjective. And we are thoroughly in earnest, as is our duty under our oaths, to enforce state authority, in state affairs, over state officers, and on foreign corporations who come here, *ex gratia* of state law, and then set the law at defiance. We mean to suffer no trifling here. The writ must be so framed that the secretary not only shall promptly revoke the existing license, but shall refrain from granting any other license to the insurance company for three succeeding years, and that he certify the revocation to this court within twenty-four hours after service of the writ upon him.

Let the writ issue at once in accordance with this opinion.

The following is the order made in this case, omitting the formal preliminary clause:

"It is ordered and adjudged that the said demurrer be and the same is hereby sustained to the said return; and it is further ordered and adjudged that a peremptory writ of *mandamus* do forthwith issue out of and under the seal of this court, to be directed to the said respondent; commanding him, and in his absence the assistant secretary of state, forthwith, within twenty-four hours after service of the writ, to vacate, revoke and recall the authority, license or certificate mentioned in the respondent's return, and every other existing authority, license or certificate made, executed or given by the respondent to the Continental Insurance Company of the city of New York, to do or transact any business in this state, and absolutely to refrain and abstain, to the full period of three years, from granting, giving or issuing the same or any other authority, license or certificate to the said Continental Insurance Company of the city of New York to do or transact any business in this state, and to file with the clerk of this court, on the day next succeeding the service of this writ, a certified copy of the record or paper whereby such authority, license or certificate shall have been and be so vacated, revoked and recalled. Which writ shall be returnable on the 5th day of September next."

On the 16th of August, 1876, the respondent filed with the clerk of this court a certified copy of an entry made that day in the Insurance Record kept in his office, showing that he had on that day revoked the license of the Continental Insurance Company of the city of New York, and had mailed an authenticated copy of the order revoking such license to the secretary of the company, and a similar copy to each of the agents of said company in this state. On the 24th of the same month, the respondent made due return of the peremptory writ, showing his compliance therewith.