PARKER, J.
Both this case and that entitled Toledo v. Toledo, come into, this court by appeal from the court of common pleas, whrre, they were begun. The evidence was submitted to this court in both cases at the same time, to be considered in either case or both cases, so far as competent and applicable to the issues; both were argued together, and therefore they will both be considered and decided at the same time.
These cases involve the general question of the validity of an alleged sale by the city to the Kerlin Brothers Company of a natural gas plant, the property of the city, consisting of a main pipe line, about forty-four and one-half miles long, extending fnm the city into and through Wood oounty, and into. Hancock county; about seven and one-half miles of lines of pipe connecting said main line with gas wells in said countie# —ail of said main and connecting lines being buried beneath, the surface; certain gas leases in said counties, covering about *606 two thousand acres; forty-seven gas wells and the equipment thereof; three pumping stations, located on small parcels of land owned by the city and consisting of buildings equipped with boilers, engine's and pumps to force gas from said wells through said lines to the city; and a telephone line about forty-four miles in length; all of the property above mentioned lying outside of the city: and consisting also of the following described property within the city: something over ninety miles of pipe extending along and buried beneath the streets of the city and submerged beneath the river within the city,used in conveying gas to the inhabitants thereof for heat and light; also pipe and other supplies on hand not in use, and tools and office furniture.
The first case is an action of replevin brought by the Kerlin Brothers Company, a corporation, against the city of Toledo alone, to recover possession of all the pipe in the lines outside of the city and in the wells outside of the city, and some other property, the plaintiff claiming that it is entitled to possession as owner thereof. The city, through its attorney, who appears to be the city solicitor — and I make that remark for the reason that the answer does not disclose that the attorney is the city solicitor — files an answer and cross-petition reciting all the steps taken by the Kerlin Brothers Company and the city' in the matter of the alleged sale, pointing out certain alleged-irregularities which it contends vitiated the proceedings, and also alleging that said attempted sale was for a price so far below the real value of said property, and was so ill-advised, in view of the losses likely to result to the city, that the transaction amounted to abuse of corporate power on the part of the oonncil acting in the premises for the ci*y, within the purview of section 1777, Bevised Statutes, and that therefore the alleged sale was null and void.
This pleading closes with a prayer that the plaintiff may be enjoined from taking possession of the property and from taking any farther steps in the premises in pursuance of the transactions repecting said pipe line theretofore carried on and yet pending between plaintiff and the city council. The question whether the city solicitor prosecutes this cross-petition under section 1777, Bevised Statutes, has been discussed by counsel, but we do not deem it necessary to pass upon the question, and therefore shall not do so. We hold that the answer presents an issue as to ownership and right of possession of this property, and that the issues made by this cross-peti ■ tion and the reply thereto are brought into this court by the Appeal.
The other case is a suit brought by the city solicitor in the name of the city, under section 1777, Bevised Statutes, against the city, all the members of the council and the mayor and clerk thereof and the Kerlin Brothers Company; and in the petition — which was filed on the same day that the cross-petition in the other case was filed — is set forth substantially the same facts as are averred in said cross-petition, and the same conclusions as to the illegality, irregularity and invalidity of the action taken by the city council on the one hand and the Kerlin Brothers Company on the other to effent the alleged sals of the gas plant; and the prayer thereof is for an injunction against any farther aotion by the mayor or clerk of. the *607 city or said the Kerlin Brothers Company toward the accomplishment of the attempted sale of said property within the city and the real estate outside of the city, or the giving or taking of possession of any of said property within the city, or said real estate outside of the city, in pursuance thereof.
Issues were joined by answer and reply. It will be seen that the two oases cover all the property, each covering_ a part thereof. Though the pleadings are voluminous, covering fully the history of these transactions, the only controverted fact is that respecting the value of the property in question. I will state briefly the history of the transactions respecting this alleged sale.
Some time in July or August, 1899, a resolution was adopted by the common council authorizing the city clerk to advertise the property for sale, and invite bids. Some time in August bids were received; the bid of one Biok for all of the property Inside and outside the city was $256,000; the bid of the Northwestern Ohio Natural Gas Company f<fr the same property was $228,000. The Kerlin Brothers Company for the property outside of the city bid $86,000. While the question of the elosmg of the contract to the highest bidder was under consideration before the council, Samuel M. Jones, the mayor of the city, made an offer to the city of $300,000 for the property, including franchises similar to those involved in the so-called franchise ordinance in this case which the council undertook to pass for the Kerlin Brothers Company. These bids, as well as the offer of Mr. Jones, were rejected, and on November 13; 1899, a resolution was adopted directing the clerk to again advertise for bids. The resolution was offered on October 9, but after some vicissitudes, including its being vetoed by the mayor, was finally adopted November 13. It reads as follows:
“Resolved by the common council of Toledo, that the city clerk be instructed to advertise for bids for the sale of that part of the city of Toledo natural gas plant lying outside the city of Toledo. Bids will be received separately on that part lying within the city and .that part outside the city.'1
This resolution was read on but one day by the board of aldermen, and was passed without suspension of the rule requiring a reading of certain ordinances and resolutions on three different days; and the same course was pursued when it Was afterwards passed by the board of councilman, by a vote of twenty-four yeas to two noes, over the veto of the mayor. In pursuance of that resolution the city clerk published' in the Toledo Daily Commercial, a newspaper of general circulation in the city of Toledo, for two weeks, the following notice:
“Notice.
“Proposals for the sale of the city gas plant.
“Sealed proposals will be received at the office of the city clerk of the city of Toledo, by the undersigned, up to twelve o’clook (standard time) M. of Monday the fourth day of December, 1899. for the purchase of the separate parts of the city natural gas plant, as hereinafter, mentioned, together with ail its appurtenances, including all pipes, and connections laid in the city of Toledo, Ohio, pipe lines and connections elsewhere, together with all wells, rights in wells, tubing, and machinery, appliances, tools, materials, lands, leases, and leasehold interests now owned and held by said city in connection with its *608 natural gas plant, with the right to lay down, maintain and' operate in the streets, alleys and public places of said eity, ■ gas pipes and their connections, fur the purpose of supplying natural and manufactured gas to consumers in said city. The purchaser to assume all obligations pertaining to such property and leases from and including the day of purchase.
“Separate bids will be received for the part of the natural' gas plant lying within the city limits, and for that part of the natural gas plant lying outside.the city.
“Intending bidders can obtain a description of all said property owned or controlled by the city of Toledo, by calling upon, the undersigned.
'“Bach bidder must deposit with his bid a certified check drawn on some Toledo bank, in the sum of $15.000. payable to-the order of said city, and which «imi shall become forfeited to said city in the event that said bidder refuses to enter into a contract in accordance with his bid wi'hin ten days aftet the same has been accepted, and the proper resolution passed by tbe city council conveying said property to said bidder. The’! city reserves the right to reject all bids which may be offered. ’ “By order of the common council.
“William O. Holst. City Clerk.’’
- In pursuance to said notice, two bids were filed before noon of December 4, 1899, as follows:
“Toledo Ohio. December 4, 1899.
“To the Honorable Common Council of the < it.v of Toledo
“Gentlemen: In response to your published invitation for bids, a copy of which is heieto attached, the undersigned will pay for all that part of tbe property of said cifv of Toledo ras advertised), owned, used or connected with the city natural gas plant, as described in said advertisenient and lying outside of the city, the sum of one hundred and two thousand and 00-100 f$102.000.00) dollars, and w ill pay for that property of the said city of Toledo, owned (as advertised), used or connected ■with the city natural gas plant, as described in said advertisement. and lying within the city, the sum of one hundred and twenty-six thousand and tiO-100 ($126,000.00) dollars.
“Or will pay for the whole of the said city natural gas plant and ail parts and parcels thereof, whether lying within or outside said city, andas described in said advertisement, and' shown by the description in said advertisement, the sum of two hundred and twenty-eight thousand and 00-100 ($228,000.00) dollars.
' “This bid is made upon tbe following express conditions:
“That the city of Toledo, Ohio, if the undersigned so elect, will grant them'by ordiname satisfactory to them, the right to continue to operate said city natural gas plant, and to take up the same And to lay down and maintain gas pipes and their connections, and all necessary appliances to enahle them to continue the supplying of gas to consumers in said city, in the same manner as is now donp and proposed to he done by tbe present operation of said plant. Also fixing, satisfactory to thsm, tbe price they may charge to consumers for gas.
“The undersigned to assume only such obligations as arise from and after the date of purchase, but not to be liahle for any obligations that have or mav accrue or arise before said date.
“The amounts bid, to be paid in case of tbe acceptance of *609 this bid. or any part thereof, within twenty days after tbe passage and legal publication of the necessary ordinances and resolutions conveying said property to the undersigned, and' granting to them the right to furnish gas, fixing prices, etc., above referred to.
“A certified check on the National Bank of Commerce of; Toledo, Ohio, in the sum of fifteen thousand ($15 000.00) do!-, lars, payable to the order of said city deposited herewith.
“Respectfully submitted, . ■
“Th9 Kerlin Bros. Co. ;
“By E. M. Kerlin.
“Secretary.”
There was also another bid, which I will not take time to-read, by Charles D. Hauck, of $115,000, for the property inside the city, and of $90,000 for the property outside the city, and for the entire property, $205.000 00; and that was also accom-' panied by a certified check for $15,000.00.
On December 11, 1899, a resolution was introduced In the beard of councilmen reading as follows:
■ “Resolution accepting the bid of the Kerlin Bros. Company for gas plant lying outside of city of Toledo
“Resolvedbytbe common council of the city of Toledo,' Ohio, that tbe proposal of tbe Kerlin Bros. Company, for the; purchase of all that part of the property (as advertised),owned, used or connected with the city natural gas plant, lying outside the city of Toledo, with its appurtenances, including all1 mains, pipes, gas and oil wells, gas and oil leases, meters,-' materials, machinery lands and appliances, appertaining or belonging to said plant or used in connection therewith, at the price of $102,000.00. be, and the same is hereby accepted, and upon the payment of the purchase money, the mayor and city clerk are hereby authorized and directed to execute and deliver to the said the Kerlin Bros. Company, proper deeds and conveyances of all of said property.”
That resolution was duly passed, and, after being vetoed by the mayor, was again passed by a two-thirds vote of the conn-oil, as provided by law, and was duly published as required by statute in tbe easp of ordinances, on February 15 and 16, 1900.
At-the same date that this resolution was introduced, another, identical in form, with respect to the inside property, was introduced, and that was passed in the same way, but I think-perhaps a few days later; at all events, it was duly passed and published.
On February 26, 1900, there were introduced in the beard of aldermen of said city, two ordinances: one, which has been called in argument the “Franchise Ordinance,” providing that the Kerlin Bros. Company or assigns should have the right to operate this gas plant under certain restrictions and according to certain regulations provided in the ordinance. That ordinance was passed March 5, 1900. The other ordinance was one fixing the maximum rate at which toe company might sell gas, if they should operate the plant; and that has been described in the arguments as the “Rate Ordinance”. That was also passed March 5 1900. Upon being presented to the mayor for his approval, both of those ordinances were vetoed. Thereafter, and during the life of this council, the rate ordinance was-again brought ujj for passage and defeated; that is to say *610 it failed to receive the necessary votes to pass it over the veto of the mayor. The franchise ordinance was passed by the necessary vote, but not in time to permit of its being published and taking effect within the life of that council, the terms of certain members expiring before there could be due publication of.the ordinance. No ordinance has ever been adopted by the common council of the city of Toledo fixing the price that said the Kerlin Bros. Company might charge in the said city of Toledo for gas. After the final passage of the above resolution purporting to accept the bid of the Kerlin Bros. Company for the outside plant, and before the introduction or passage of the ordinances above referred to — that is, the rate and franchise ordinances — the Kerlin Bros. Company filed, with the common council of Toledo, Ohio, a written acceptance of the same as to the part of the plant lying outside of the city of Toledo,and therein signified its willingness and readiness to pay, and tendered to said city the amount called for in said resolution, namely, the sum of $102,000.00. Most of these facts I have stated from the agreed statement of facts submitted to us by counsel.
A written acceptance of the resolutions, both as to the parts of the plant lying within and those lying outside of the city, signifying its readiness and willingness to pay to the city the amount called for in said resolutions, was filed by the Kerlin Bros. Company with the council, and paying-in orders were demanded, which were refused by the city auditor. This was before either the rate ordinance or the franchise ordinance had been introduced.
On March 9, which was after both these ordinances had passed both the boards of council and were in the hands of the mayor, the Kerlin Bros. Company laid a written communication before the common council, to-wit:
“Toledo, Ohio, March 9, 1900.
“To the Honorable Common Council of the City of Toledo,Ohio.
“Gentlemen: The undersigned, the Kerlin Bros. Company, of Toledo, Ohio, hereby give you notice that they hare accepted and do hereby accept the terms and conditions of certain legislation, passed by your honorable body on the 15th day of January, 1900, selling to them all that part of the property of the oity of Tolelo, owned, used or connected with the city natural gas plant; lying outside of the city of Toledo, with its appurtenances, including all mains, pipes, gas and oil wells, gas and oil leases, meters, materials, machinery, lands and appliances appertaining or belonging to said plant or used in connection therewith as described in said legislation.
“We hereby waiving any conditions in our bid, expressed or implied, as to the sals of the property above described, which may require the granting to us of a franchise to sell gas in the city of Toledo, and fixing the price thereof.
“Very respectfully,
“The Kerlin Bros.
“By R. G. Kerlin, President.”
And on the next day, March 10, the company paid into the city treasury the sum of $102,000.00, and took from the treasurer the following receipt:
“City Treasurers Office.
‘'Toledo, Ohio, March 10, 1900.
“Reoeived from the Kerlin Bros. Company to be placed to the *611 credit of the sinking fund, one hundred and two thousand and 00-100 dollars ($102,000.00) for purchase of gas plant (outside)..
“Jos. B. Yost, Treasurer.
“F. S. Hodgman, Deputy.”
On April 6, the common council passed this resolution:
“Resolved by the. common council of Toledo, that the com- ■ mon council of 'loledo, having by proper legislation, sold to the Kerlin Bros. Company, all that part of the natural gas plant of said city outside of said city, described in said legislation, at and for the sum of one hundred and two thousand dollars. And said the Kerlin Bros. Company having paia into the treasury of said city, said sum of $102,OoO, and the same having been accepted by said city, and said the Kerlin Bros. Company being now the owner of said described property, and the said city is incurring great damages, therefore, the natural gas trustees of the city of Toledo are hereby authorized and directed to surrender and deliver possession of all of said property. including all real estate included therein, to said the Kerlin Bros. Company.
“And the city clerk is directed to send a copy of this resolution to said natural gas trustees at once upon its passage.
“ Adopted April 5, 1900.
Attest:
“William O. Holst, City Clerk.”
Said money is still in the possession of said city.
On March 10, 1900, the Kerlin Bros. Company addressed and sent to the mayor, the Hon. S. M. Jones, a letter upon the subject, reciting what had been done in the matter of paying in the money, etc., and demanded of him that he execute and deliver to the company a deed of conveyance of said property, as provided in said legislation.
On April 18, 1900, which was after the expiration of the terms of many of the members of the council under which this effort to sell was inaugurated, the Kerlin Bros. Company filed with the clerk the same waiver of all conditions with respect to franchise or rate ordinances, in so far as the same might pertain to the inside property, and agreed to pay $126,000 therefor without regard to such legislation. The exact facts as to the expiration of the terms of ceitain members of the council and certain other pertinent facts are set forth in this agreed statement as follows:
“The term of office of eight members of the board of aider-men, who were in office on March 28, 1900, expired on April' 9, 1900, on which said last mentioned date their successors in office duly qualified and a new board of aldermen of the common council of the city of Tole'do, was then duly organized by the election of a president and vice-presidei t. That the term of office to which they had been elected, of fifteen members of the board of councilmen of the common council of the city of Toledo, who were in office on April 11, 1900, expired on said last mentioned date, and their respective successors in office then duly qualified as members of the board of councilmen of said city of Toledo, and thereafter, and on April 11, 1900, the new board of councilmen of said city organized by the election of a president and vice-president.
' “No proceedings have been taken or attempted to be taken by the common council, or any board of officers of the city of *612 Toledo, in relation to the sale or disposal of any part of the natural gas plant,or of any of the prooerty in question in these cases, except as herein above set forth.
“Neither the mayor or the city clerk of Toledo, has executed and delivered to the said company, any deed or other conveyances of any of said gas plant property, or of any of the property in ques.'ion as aforesaid That the natural gas trustees of the city of Toledo have never consented to or taken any steps, towards the sale of any of said property.
“The common council of the city of Toledo has never adopt-, ed any general ordinance providing for the exercise of the. power conferred on the said city of Toledo, by section 1692, Revised Statutes for the sale of the property in question, or-any other property of the city of Toledo. No vote of the electorsof Toledo has ever been had authorizing the sale of the property; or any part thereof.” ■ ■
■Then follows in the agreed statement of facts a schedule of the. property which I have described in general terms. >
I will proceed to discuss briefly certain of the questions in' the case which affect the validity of this alleged sale, taking up the objections urged on behalf of the city, and, if the tax-, payers are represented here.on behalf of the taxpayers of the city.
i. First, it is insisted that the city has no power to sell this property at all. The statute providing fot the establishment, erection and operation of this plant, is found in 86 O. L. 7, and there have been some subsequent amendments. 1 believe.
In Thompson v. Nemever, mayor, 59 Ohio St. 486, where the Buoreme court had under consideration a similar statute affecting the city of Findlay and in which case was presented for determination the question whether the city of Findlay had power to sell its natural gas plant, it was held and decided by. that court that under section 1692 subdivision 34, Revised Statutes, a city or village has power to sell its gas plant. As I shall have occasion to refer to this section several times in the course of this opinion, I will now read the part referred to.
“In addition to the powers specifically granted io this title, and subject to the exceptions and limitations in other parts of it, cities and villages shall have the general powers enumeráted in this section, and the council may provide by ordinance lor the exercise and enforcement of the same.”
Then Allow paragraphs which are numbered from one up to forty in which are set. forth the subjects respecting which the council may provide for the exercise of this power: and among them paragraph 34. the one refeired to by the supreme court in the case I have cited and reading: '
“To acquire, by purchase, or otherwise, and to bold real estate. or any interest therein, and other property for the use of the corporation, and to sell or lease the same. ’
Without stopping to point out the difference between the act then tinder consideration by tne supreme court respecting the' gas plant of the city of Findlay and the law respecting the natural gas plant of the city of Toledo, we simplv say that we find no material differenoe between the two acts touching the authority to sell. Something more may be said upon that subject farther along. i
■ 2. The' second question raised is as to what officers or body may make the sale; it being contended on behalf of the Kerlirt *613 Brothers Company that the power is lodged with the common council; and it being contended on behalf of the city — or at least on behalf of the gas trustees, who are represented here by counsel though they are not parties to either action, that if the city has power to sell at all, the sale must be made by the gas tru8te.es, or by the concurrent action of the gas trustees and the common council.
By section 1692, paragraph 34, Revised Statutes, authority is ■conferred npon cities to sell.- and authority is conferred upon the common council i.o provide for the exercise of this-power. The making of a sale of any kind involves a contract of sale. The power to contract is, by section 1693, Revised Statutes, placed in the council, and it is therein provided that this power shall be exercised through the medium of an ordinance or resolution; and therefore we conclude that section lt'92, paragraph 84, Revised Statutes, wherein it is provided that the council may provide for the exercise of said power, fairly con-st ued or paraphrased, means that the council may exercise this power of sale through the medium or instrumentality of an ordinance; and we hold that the trustees need not concur in this action. No provision is found limiting the authority of the council in the premises, or providing that the concurrence of the trustees shall be required. It is provided in section 2675, Revised Statutes, with respect to the sale of school property, or waterworks, or hospitals, infirmaries, etc., that the trustees having charge of those different properties and works shall concur; that is to say, that their concurrence in the action of the council shall be required in order to effectu7 ate a sale of such properties; but we find no such provision with respect to natural gas trustees; and we think that the fact that this provision is found with respect to these other properties and boards and not with respect to the nalural gas trustees, affords a very potent argument, in support of the contention that the concurrence of the gas trustees is not required.
Much has been said about the inexpediency and injustice of the provision which permits the council to take this-particular property in charge and sell it and thereby deprive the city thereof — taking it away from the trustees to whom the property and its management have been entrusted, and by the same act in effect depriving the trustees of their offices and the emoluments thereof, without their being consulted in the matter at all; but with that question we apprehend we have no business; that is a question of legislative policy,and the legislature having so provided — whether wisely or unwisely we will not pretend to say to the law as we find it we must give effect;
Section 249ld, Revised Statutes, passed subsequently to the original statuie on the subject, has been called to our attention in this connection. That section provides. “That when any city of the third grade of the first class,” which described Toledo, “in this state is, or hereafter may be lawfully engaged in the production and sale of natural gas, and whilst so engaged produces or procures any petroleum or rock oil, or lands or leases containing such oil, the natural gas trustees of such city are hereby authorized to operate or sell such wells, lands or leases as they may deem best.”
•. And it further provides as to the disposition to be made of the fund* arising from such sale. This is perhaps worthy of some consideration as indicating at least the legislature’s opin¿ *614 ion of the power of the trustees In the premises. If the -legislature had thought that the trustees had general power to sell, of course, this section would not have been adopted. This action on the part of the legislature amounts to a legislative construction of the laws in force to the effect that they conferred upon the trustees no power to sell. Thompson v. Mayor, etc., supra, in our judgment fairly decides that in that case at least — and we conclude that if It is so in that case it is so in this — the power is vested in the council alone, because the decision is to the effect that the power of sale is found under seotion 1692, subdivision 34; and these powers cannot be delegated, but must be exercised by the council through the medium or instrumentality of ordinances or resolutions.
3. The third question arises, as to how and under what statutes this authority to sell must be exercised.
We have already indicated that this must be done under section 1692, paragraph 34; but, with respect to real estate, the authority of the council under that section is limited by section 2673a.
As to what is “real estate” within the meaning of the municipal code, some light is given by section 1536, Revised Statutes, and I read the part thereof defining real estate, to-wit:
“In the interpretation of this title, unless the context shows that another sense was intended * * * ‘property’ includes real, personal and mixed estates and interests; and ‘land’ and ‘real estate’ include rights and easements of an incorporeal nature, but this enumeration shall not be construed to require a strict construction of any other words in this title.”
So that perhaps, under that definition, within the municipal code, “real estate” covers rather more than it would under the general definition of the law. We have held that gas and oil leases, for certain purposes and in certain aspects, including the right of the sheriff to sell upon execution, are to be treated as personalty. It is very doubtful whether, within the purview of this section,such leases could be regarded as personal property, since they involve rights and easements ias this court has held) of an incorporeal nature.
Now coming to section 2673a, Revised Statutes, which, as I have said, in our opinion limits section 1692, paragraph 34, in so far as “real estate is concerned, that provides “That the council of any city or village, which has not a board of improvements,or board of public works”, fand that includes this city) “shall have power, threeflfths of all the members elected thereto voting therefor, to offer for sale or lease any real estate and appurtenances belonging to such city or village, and place the proceeds arising therefrom to the credit of such fund or fnnds as to said council may seem- proper; provided that irritation of written bids for such sale or lease shall be first published for two weeks in some newspaper of general circulation in such city or village, and the sale or lease shall be awarded to the highest and best bidder, but all bids may be rejected and said council may at any time within twenty days after opening such bids award the sale or lease privately to any person at a price not Iobs than the highest bid received ; or such lease or sale after similar notice may be made by public auction; and provided further, that said council may until suoh invitation and award or auction, lease any of said property from month to month upon such terms as they choose, without advertisement so as to produce revenue.”
So it will be seen that in order to sell real estate a three-fifths vote of the members of the council and an advertisement for two weeks are required.
*615 / With respect to a part of this property |at least," it is " clear 'that the proceedings must be under section, 267,da,. Revised ‘Statutes.
4. A question is raised as to the validity of - the , preliminary legislation which was adopted by the council directing the .clerk to advertise for bids. As I háve stated, this resolution 'was passed without a suspension of the rules requiring a reading on three different days, as provided by section 1691, Revised Statutes, with respect to resolutions and ordinances • of a general or permanent nature.
It is cot tmded on behalf of the city that this is a resolution of that nature, and that, therefore, such reading or suspension of the rules was required.
On behalf of the Kerlin Brothers Company, it is insisted that "it is not a resolution of that character. This is an important .question in the n».se. We are of the opinion that if it is a resolution of a general or permanent nature, and is a resolution required to be adopted as one of the necessary preliminary steps for the sale of this plant, the subsequent proceedings lack the necessary foundation or basis to make them legal and to make the sale valid. But the majority of the court are of the opinion that this is not such a resolution as is required by section 1694. to be read on three different days.
It will be observed that this resdution is simply an order or direction to the city clerk to advertise for bids; in other words „ti put an advertisement in a paper, as required by section 2673a, Revised Statutes, to advise all persons interested in sale of this property that bids will be received by the common council. In the advertisement based upon this resolution it, is provided that all bids may be rejected by the council, so that the highest bidder under this advertisement or invitation does pot acquire any right as against the city to have the property awarded to him upon his paying the amount of his bid. The statute contains the same provision. Therefore this resolution or action is not binding upon the city.
. We do not undertake to say that the subject matter to which this legislation pertains is not of a general or permanent nature; we think it is, notwithstanding the transitory and elusive and somewhat disappointing character of natural gas, hut we do nor regard that as decisive of the question. Manifestly the value or importance of the property or interests involved can have no influence upon the legal question now nnder consideration. The statute makes no distinction based on value or quantity of property involved. If such a resolution respeet', ing the sale of a, pipe line or other property worth a million or more dollars must be passed withthe formalities required by Section 1694. Revised Statutes, it follows that if the property to be sold were worth but a trifling amount, the same formality must, be observed, so that no force can be added to the argument that such formality was required in this case by the statement that the property involved is very valuable. And if the proposition that the resolution is of a permanent nature is based upon the fact that the ultimate object, i. e., a sale and permanent transference of title, has in it the element of performance. the same can he said, with equal truth and force of a,.sale of a, worn-out shovel or pick, or other article of small value, solely on the ground that this property is of a perma *616 .nenCcharacter, without respect to its value as we hold that the subject master of the legislation was of a permanent nature.
It is said by the supreme court in Campbell v. Cincinnati, 49 Ohio St., 469, with respect to the ordinances there under consideration: “The subject matter of the ordinances was of a permanent nature — the same test we would apply in making the character of a law as general or local, to depend on the character of its subject matter.” But it will be seen that in that case, as well as in every other case, so far as our search lias informed ns, in which it has been held that an ordinance or resolution under consideration was governed by section 1694, Revised Statutes, as to the mode of passage, such ordinance or resolution was required as a step, as a prerequisite, as a condition precedent- in the carrying out of the object in view,' and it was also required that such step should be .taken by resolution or ordinance, and not otherwise.
Another case which has been cited is Elyria Gas & Water Co. v. Elyria, 57 Ohio St., 374. In that case it was held that a resolution providing for the taking of a vote of the citizens to determine whether or not bonds should be issued, was a resolution of a general and permanent nature within the meaning of section 1694, Revised Statutes, and the court puts the decision upm the ground that the adoption of such resolution is a step to be taken in the accomplishment of the ultimate purpose. But it will be observed that in that case also, the statute expressly requires that such a stpp shall not only be taken, but shall be by resolution; section 2837 providing that: “Whenever the trustees of any township or hamlet, or the council of any municipal corporation shall by resolution declare it necessary to issue and sell the honds of such township, hamlet or municipal corporation,” etc., then they may proceed to'the other steps pointed out.
In Upington v. Oviatt, 24 Ohio St., 232. the resolution was required. That was a proceeding to condemn property, and a resolution setting forth the necessity of'condemning the property was required bv the statute. It was held that the resolution was not required to be read or passed by the formalities required by section 1694; Revised Statutes, because it was a resolution declaratory of the existence of a fact, and declaratory of a purpose, and was not of the nature of legislation providing for future action.
Ordinarily, all that is required to effect a sale of property is an offer by the purchaser and acceptance by the seller,- or an offer by the seller and acceptance by the purchase, followed by payment or delivery. Those are the essential things to acoomolish a sale. Where the sale is to be made by a municipality, certain formalities are required — it mu«t be done in a certain way, and these rules which are prescribed, and these formalities which are required, we think must be strictly and carefully observed in order to insure the validity of the transaction; but we do not understand that it is the province of a court to undertake to prescribe any new or additional formalities — to require any other steps or formalities than those required by the statutes, even though th6 court may be of the opinion that othor requirements and other steps would be advisable.
. The majority for the court are of the opinion that_a resolu *617 tion, although of a general or permanent nature, to come within the purview of section 1694, Revised Statutes, must be a necessary resolution — a resolution required. If the same thing can be accomplished by a mere motion, and the council without necessity therefor adopts the form of a resolution — an unnecessary formality — it does not follow that the council thereby commits itself to a course which would require of it still farther formalities appropriate to resolutions but not required in the case of motions; we are of the opinion that this direction or order to the clerk is not of the character of legislation. But, assuming that it is legislation, the statute provides, in section 1665, that the legislative acts of the council may be accomplished by ordinance, resolution or order. Now, suppose this order, or direction to the city clerk to advertise for bids, should be regarded as rising to the dignity of legislation, why may it not be accomplished by an order? And if by an order, what law is there requiring that such order shall be passed with the formalities required in section 1694? None that we know of. As we have already said, the observance of unnecessary formalities does not require of the council that it shall thereafter proceed consistently, and therefore that it must follow to'the end the path unnecessarily entered upon. Suppose the council had adopted an ordinance directing the clerk to advertise for bids — a thing which we conoeive to be altogether unnecessary — would it follow that that ordinance involving merely an order or direction to the clerk to advertise for bids, could not take effect until it had been published, as required of ordinances of a general or permanent nature? We think not. We think that whether it is called an order, resolution or ordinance, it amounts simply to a direction to the clerk whioh might as well be accomplished by a mere motion.
Our conclusion upon this matter then is, that the resolution, to come within the purview of section 1694, Revised Statutes, must not only be or provide for a necessary step toward the accomplishment of the ultimate object, but it must be a step that cannot be taken otherwise than by resolution.
5. The next question that we encounter is whether a precedent ordinance is required by section 1692-34, Revised Statutes, in order to make a valid sale of property — that section reading that the council may provide by ordinance for tho exercise of powers. Must the oouncil in some way provide for the exercise of the power before the power is exercised? We hold that a fair reading of that provision is that the council-may exercise the power through the instrumentality of an ordinance.
6. We are of the opinion that to accomplish a sale in pursuance of sections 1693-34 and 2673a, Revised Statutes, an ordinance must be passed and published. The question, therefore, meets us, whether this legislation which is denominated a “resolution” accepting the bid of the Kerlin Brothers Company for the gas plant and directing that the price shall be received and that the proper conveyances shall be made, etc., is an ordinance, and sufficient for the purpose. And upon this question the court is not unanimous, but a majority of the court is of the opinion that that is to all intents and purposes, an “ordinance.”
*618 In Blanchard v. Bissell, 11 Ohio St., 99, something is said by Judge Scott in the way of undertaking to distinguish between an “ordinance” and a “resolution.” It was held in that case that the signature of a presiding officer — the mayor, I believe — was not necessary to the validity of the ordinance; and at page 103, this is said:
“Besides, we are not aware of any provision of the statute which requires a town council to levy taxes solely by ordinance. Such an act, by whatever name it may be called, is properly in the nature of a resolution. It is of a temporary character, and prescribes no permanent rule of government. And though clothed in the forms of an ordinance, it may well have the offset of a resolution without the signature of the presiding officer.”
In other words, it was not to be condemned because it was called an ordinacne instead of a resolution. And we think the same rule applies where the instrument is in effect an ordinance, but is denominated a resolution. I have referred to this for the purpose of calling attention to the attempt of the learned judge to distinguish between an ordinance and a resolution. While the features indicated may, in a general way, be regarded as forming a very good basis for a general rule— yet when you attempt to apply such rule to ordinances and resolutions provided for by our statutes, it does not cover the subjeot. You cannot say that every legislative act that is denominated an ordinance, under our statutes, prescribes a permanent rule of government.
Tha statute.expressly provides that a contract may be entered into by ordinance. Now, would any one pretend to say that such an ordinance which is a contract after it is passed — prescribes any rule of conduct or any permanent rule of government? It simply accomplishes the object in view — the making of the contract. In a contract of sale or purchase, for instance, the whole transaction is closed up by the ordinance. It is, in that sense, of a temporary character, although the results may be permanent, but it does not prescribe any rule ■of conduct for the people. And so with an assessment ordinance. It is required by the statute that upon certain improvements an assessment against the property shall be made by ordinance, which shall describe the property and shall set out the amount that shall be laid as an assessment upon each part. Of course,it cannot be said with respect to such an ordinance that it prescribes a permanent rule of conduct for anybody. In that respect it is in the nature of a resolution, according to the general rule laid down by Judge Scott. Taxes must be levied by ordinance, and it cannot be said that an ordinance levying taxes — prescribing the rate for the year — is an ordinance prescribing a permanent rule of government; it also comes within Judge Scott’s definition of a “resolution,” since it is legislation of a temporary character. This confusion or uncertainty exists not only in Ohio,but elsewhere. There may be, and I believe there are, states in which it is prescribed by statute that an ordinance shall have certain formalities which shall distinguish it as an ordinance, as “Be it ordained”, etc., and that a resolution shall have certain formal parts, as “Be it resolved!’, etc., but we have no such distinctions. The constitution of the state provides for the formal parts of a stat *619 ute; so that we may determine whether certain legislation may be regarded as statutory, perhaps, by the presence or absence of the words, “Be it enacted”, etc., but we have no law prescribing the forms of resolutions or ordinances. I think the general weight of authority is to the effect that the form adopted in municipal legislation is a matter of no consequence, but that if a legislative act should be and in substance is an ordinance, and all the rules prescribed for the adoption or passage and publication ,of ordinances in order to have them take effect have been observed and complied with, it shall take effect as an ordinance, and vice versa as to a resolution. I want to call attention to a few cases on the subject:
35 Penn. St., 231. I read a paragraph from page 236:
“The next objection, that the order for opening was by joint resolution, and not by ordinance, seems to be disposed of by uniform legislative usage in the city government and by a fair analogy to the constitutional practice of the state legislature. Both joint resolutions and ordinances are passed by both councils, and approved by the mayor; and by the 17th and 18th sections of t.he act of 11th March, 1789, the laws, ordinances, regulations and constitutions of the city must be published and recorded; and by the 44th section of the consolidation act, the laws and ordinances of the city must be published for the information of the citizens. It is a legislative act, a law, and it matters not whether it b9 called a joint resolution or an ordinance.”
I call attention to Kepner v. Commonwealth, 40 Penn. St., 130, but will not take time to go into the case farther than to read some short paragraphs, indicating the opinion of the court upon the general subject. Chief Justice Lowrie, in announcing the opinion, undertakes to distinguish between resolutions, ordinances, regulations, by laws, etc., and says, at page 129, 130:
Certainly there is some distinction between these words in ordinary usage. Regulation is the most general of them, meaning any rule for the ordering of affairs, public or private; and it thus becomes the generic term from which all the others are defined, specified or differentiated. Ordinance is the next mos general term, including all' forms of regulation by civil authority, even acts of parliament. With us its meaning is usually confined to corporation regulations. Ordinances are all sorts of rules and by-laws of municipal corporations. Ordinary usage shows this, and it may be found illustrated in Willoock On Corporations, 73.
“Resolution is only a less solemn or less usual form of an ordinance. It is an ordinance still, if it is anything intended to regulate any of the affairs of the corporation. If the word “ordinances” in the act of assembly, does not include such resolutions, the law that requires ordinances to be submitted to the mayor for his approval, is of no force at all, because it allows its substantial purpose to be defeated, by giving to ordinances the form of resolutions.
“ What we have said cannot, of course, apply to rules of council properly so called, for these are mere rules of practice of the council itself in its d°liberations, passed by virtue of an authority inherent in all associated functionaries, and implied when not expressly granted; and establishing the forms under *620 which they act in the process of passing ordinances. They are not ordinances, but rules for passing ordinances.
“Ordinance, then, is the generic term for acts of council affeoting the affairs of the corporation; and we can make no distinction between them founded on the difference of degree in which they affect those affairs. Such a distinction would necessarily be so indefinite as to give rise to great difficulties in practice, and involve the danger of frequent resorts to the courts to settle disputed questions, and of frequent legal controversies upon the validity of acts of councils, even after they may have been carried into effect.”
First Municipality v. Cutting, 4 La., 335.
“It is no objection to the validity of an ordinance of one of the municipalities of New Orleans, containing a prohibition and attaching a penalty to its violation, that it purports by its terms to be a resolution.”
Authorities to the same effect may be found in 1 Dillon on Municipal Corporations, 388; 45 N. J., 279 and 40 Wis., 204, are to the same effect, and we find no authority holding a contrary doctrine. There are cases where it is held that matters to be accomplished by ordinance cannot be accomplished by resolution, but in all such cases, so far as we observe, the resolutions in question were not passed and published with the formalities required of an ordinance, and that fact is emphasized by the court.
In the case at bar each resolution accepting a bid contains every essential provision of contract of sale: i. e., the provisions that the offer is accented; that the purchase money'shall be received and covered into certain funds, and that a certain conveyance shall be made.
. Whether this is real or personal property, though much debated, it is not necessary to decide, since we hold that the requirements as to real estate have been complied with, and that is sufficient to cover personalty as well as real property.
7. Another question is whether the conditions in this bid invalidated the sale? It will be observed that the notice of «ale sets forth that in addition to accepting bids for the property, bids will be received that will-cover the “right to lay down, maintain and operate in the streets, alleys and public places of said city, gas pipes and their connections, for the purpose of supplying natural and manufactured gas to consumers in said city,” etc. The bid of the Kerlin Brothers Company contains an offer to pay $102.000 for the property outside the city, and another offer to pay $126,000 for the property inside the city, and still another distinct offer to pay $228,000 for the property inside and outside the city; and following that, it reads “this bid is made upon the following express conditions,” and then follows what I have read therefrom as to the right to continue to operate the plant, the fixing of a satisfactory rate for gas, etc. Although in one sense this proposal submitted by the Kerlin Brothers Company is a single bid, yet when we come to distinguish between the different parts, there are in fact three bids submitted. We are of the opinion that a fair construction of the proposal is that the provision as to conditions applies to the last bid only, the bid for both the inside and outside parts; that it does not apply to the bid for the inside part alone, nor to the bid for the outside part alone, and we think that is *621 made more clear by the provision that they shall have “the right to continue to operate said city natural gas plant, and to take up the same.” Said natural gas plant was composed of property inside the city as well as outside the city. No part of it could be fairly described as “said natural gas plant,” but these words describe the whole.
Again, they are to have the right to “maintain gas pipes and their connections, and all necessary appliances to enable them to eontinue the supplying of gas” (and the only gas they can continue to supply is natural gas) “to consumers in said city, in the same manner as is now done and proposed to be done by the present operation of said plant. ” They are to have the right to continue to supply gas in the same manner as is now done; and that was done through the old pipe line in the field and through Hancock and Wood counties and to and within the city of Toledo. So we are agreed that these conditions do not apply to and do not invalidate the bid as to the outside property alone.
-That is the construction that we would put upon this contract, that is to say, upon this oiler and its acceptance; but it evidently is not the construction that has been put upon it by the council and by the Kerlin Brothers Company with respect to the inside part. It may not have been the construction that they put upon it with respect to the outside plant, but that is not material, because during the life of the council in which the proceedings were inaugurated, all of the conditions with respect to the outside plant were waived. The money was paid in, was accepted, and the council directed that the property should be delivered. With respect to the inside property, however, the case is different. The Kerlin Broters Company and the counoil treated the conditions as applying to the inside part of the property until after the life of the council had expired. It is a familiar rule of construction of contracts that the court will be aided by and in many instances will follow the construction adopted by the parties themselves as indicated by their conduct. In view of the construction put upon this proposal by the Kerlin Brothers Company and by the city — in view of the fact that Kerlin Brothers & Company did not until after the legal death of this council, undertake to waive any of the conditions as to the inside plant, but were undertaking to have the franchise and the rate ordinances passed as a part of that which they had no right to insist upon, we hold that the bid and the acceptance thereof should as between said parties receive that construction, and that therefore the acceptance, so far as the inside plant is concerned, must be considered as a conditional acceptance. By accepting this bid the. council did not abdicate its power in the premises or undertake to confer upon the Kerlin Brothers Company a right to fix the price of gas in the city, but it was simply an acceptance upon the condition that if they failed to come to an agreement upon a contract fixing their right to operate and the rates that they might charge, then the bids on the one hand and the acceptance on the other would fail and would not consummate the agreement. Now, since that condition was not waived nor complied with during the life of that council, we hold that by virtue of the provisions of section 1691, Bevised Statutes, that “The council shall not enter into any contract which is not to *622 go into full operation during the term for which ail the members of such council are elected,” the transaction as to the inside property was not completed so as to go into full operation as a sale during the life of the council, and could not be completed subsequently by waiver of conditions or otherwise so as to validate the sales thereof.
8. We come now to the consideration of the last important question in the case, and that is as to the value of this outside property. We have spent several days in the hearing of testimony of witnesses and receiving other evidence as to the value of this property. It has taken a very wide range, and everything offered which was likely to reflect any light upoD the subject was received and has been given consideration. The Conclusions reached and already announced make it unnecessary for us to declare any finding as to the value of the property within the city, a problem into which enters the question of the value of the franchise and rate ordinances mentioned, and with respect to which witnesses have expressed the widest divergence of opinion, the estimated values of the privileges thereby to be conferred ranging from some millions of dollars to absolutely nothing. As to the outside property,this question does not enter into the problem, because (as before stated) we hold that the conditions expressed in the bid do not apply to this property alone. But even as to this the estimates of value are widely apart. In view of the nature of the property we cannot regard much of the testimony as to value as more than estimates, since it is impossible to exactly determine the value as the property lies, a large part of it being beneath the ground. Consequently we do not find it possible to be precise or definite in stating our finding as to the value. We can only say that we find from the evidence — and here I only speak for a majority of the court — that it is probably of a certain value, and this is based on what the purchaser or the city could probably have obtained for it in the market as soon after the bid and acceptance as it was practicable to put it on the market, and we put this probable value at not more than $200,000.00. Mr. Philipps, an expert witness called on behalf of the city, puts the whole value of the property outside the city at $227,000. On the other hand, Mr. Kerlin — who appears to be an expert also on the matter of second-hand pipe and the cost of taking it up and laying it down and what may be done with it on the market, and what deterioration may be expected, puts the value of the whole property at about $122,000. Now these two estimates are about $100,000 apart, and they are perhaps the nearest together of those given by any of the witnesses produced by both parties. In point of information and ability to speak intelligently with respect to the value of this property, we believe they are the best witnesses produced. Mr. Kerlin, of course, is interested in the matter, and his interest must be taken into consideration in the weighing of his evidence. Mr. Kerlin took into consideration certain alleged proper discounts and freight charges and other losses and percentages, that are, to say the least, very liberal, reducing the value. On the other hand, we are-of the opinion that Mr. Philipps omitted certain elements and considerations which should reduce his estimate. I will not undertake to discuss this in detail. He makes no allowance whatever for freight, in which he is per *623 haps correct He makes no allowance for the removal of the pipe from the place where it would lie after taken from the ground, but he gave the value of it where it would lie after taken up, and he allowed but three cents a foot for taking it up, which we think is tco low. We think he does not make a sufficiently large allowance for the cost of cutting off this shoulder of the pipe, which, according to the testimony of all the witnesses, must be done in order to make the pipe marketable and useful as pipe is now used; or for the joint which is required in order to make this a complete pipe, and other matters not mentioned in our judgment should modify his estimates, so that we think that the true and actual value of this pipe lies somewhere between the amount stated by Mr. Philipps on the one hand and that stated by Mr. Kerlin upon the other. Now it is said by Mr. T. P. Brown, a witness for the city, that the purchaser of this pipe is “buying a pig in a poke,” and Mr. Philipps testifies that after pipe has been 'in the ground for ten years, as this has, it is likely to be so much deteriorated that it is not safe to buy it at'all until it has been uncovered, and that he would not undertake to bid on it on account of the uncertain condition of the pipe, until it had been taken up. No objection was made to his making this statement, but it was taken with other testimony of a like character,perhaps not strictly admissible, but not objected to. Mr. Philipps testified that the life ot pipe of this character, buried as this, is about fifteen years If that is true, then two-thirds of the life o! this pipe is gone. But. he afterwards modified that by saying he thought he should have stated it at perhaps twenty-five years instead of fifteen; and if that is correct, then two-fifths of the life of this pipe is gone, and that will oertainly reduce the value of it very materially. But it is agreed upon all hands that you cannot tell much about the value of any certain line of pipe that is in the ground, as it depends upon various conditions. It may be said that the council should not have proceeded to sell this pipe in this way, as Mr. Brown puts it, “like a pig in a poke.” It has been suggested in argument that it would have been better for the council to have taken up this pipe and to have found out what condition it was in before selling it. That may be true, and yet it may be that if they had dug it up they would have found that they had something much less valuable than they supposed, and something that they could not obtain as good a price for as they have obtained for this.
The value of this pipe forms the most considerable part of the value of the outside property, but we have taken it all into consideration in our estimate. The leases are of but slight value. The pressure of gas, which affects in a somewhat corresponding ratio its volume, has fallen off in the fields from which the city has been drawing ihe most of its supply, from three hundred and seventy-five pounds ten years ago to twb pounds at the present, time. In one part of the field-up about Dundridere, the pressure was about four hundred pounds and had been reduced to thirty-five pounds; but very little gas Is brought from that section; the larger field is below, where the pressure has been reduced as I have stated. This shows the slight value of the gas leases. As a result of this falling off of gas the supply to the city has been reduced steadily, and it *624 has finally fallen so low that for the past year, as shown by undisputed testimony, the plant was run at a loss of about $10,00ii; Mr. Heston the manager, so testified; this is not taking info account the interest on the debt created on the establishment of this plant. The supply of gas, according to tne ■testimony, continues to grow less day by day, and there does not appear to he any way to mend the matter, unless by discontinuing the business or by establishing a plant to manufacture gas for sale to the peonie of this city. Whether the latter plan would probably prove’profitable is a question upon which witnesses differ widely It is a question of policy to be determined by the proper city authorities, and with which we have no business whatever, except as the testimony of witnesses upon the subject tends to throw light upon the question of the 'value of the property. What has been said with respect to the recent results of the city’s operating the plant in furnishing natutal gas is enough to indicate clearly that for that purpose the plant is not valuable to the city, but quite the contrary, and unless it can be .made more valuable by being devoted to the conveyance of artificial gas, its value is no more than wbat it will bring as second-hand material. Since the part beyond the city could not b* utilized, as it lies, in connection with the distribution of artificial gas, and since the natural gas supply in the field to which it reaches is practically exhausted, it follows that the value of the outside part as second-hand material is its only value.
The fact that this property has been twice offered to the highest bidder — once in August, 1899, and again in December, 1899 — in the methods required by the statute, and at times when the price of iron pipe of’all kinds was higher than it has been for many years — the last time the price being 25 per cent, higher than at the time of this hearing — and that (he bids on both occasions bv the different bidders were as near in amount to one another and to this last bid of the Kerlin Brothers Company as would be expected where honest competition prevails, helps us in arriving at a conclusion as to the value of this property.
When we give fair consideration to the unprofitable results which have accrued to tbe city therefrom, and the improbability of the market price of iron maintaining its present high stage, or at least that obtaining at the time at which the bid was submitted, and the chance taken by the purchaser with respect to the present condition of the property.' and with respect to the condition of the market when he shall be able to ■put the pipe upon sale, and tbe fact that a purchaser has a right to count upon a fair profit in the transaction and will make his bid accordingly, we cannot find from the evidence that the price bid bv the Kerlin Brothers Company was so far below the apparent fair market value at the time of the sale as to make the action of the council in selling it at that figure so reokles or improvident as to amount to an abuse of corporate power, or, in other words, an abuse of their discretion in the premises. Indeed, we seriously doubt, after hearing all the evidence, whether if this property were again offered, after the fullest publicity, it would bring a higher price than that for which it has been sold. It mav be remarked that during the pendency of these public negotiations, while tne subject has *625 been in every citizen’s mouth, and not only the publication ■which was regularly made in one newspaper was given to the world, but the other newspapers of the ciiy have had much in print upon the subject, so that the public has had an oppor tunity to keep close track of the proceedings, up to the time that this bid was accepted, and up to the present hour, so far as the evidence shows, after this second bid was put in by the Kerlin Brothers Company, no one had appeared to offer to the city one dollar more lor the property.
Furthermore, on the first occasion when the bids mentioned were made, tire Northwestern Ohio Gas Company, one of the bidders, was desirous of obtaining this pipe t„ URe in extending its lines to Fairfield county, and said company, by purchasing, would not only have obtained ihe pipe which it desired but it would have accomplished the closing out of the city as a competitor in the natural gas business, thereby leaving it without a competitor in the city, a result that certain witnesses seem to think would be worth millions of dollars to it, and that the city should leceive millions of dollars for permitting, and yet for the plant inside and outside and the other possible advantages, this company bid but $228,000. One fact like this is worth more to a court intent upon discovering the truth than the mere estimates of a multitude of witnesses who can not furnish reliable data as a basis for their opinions, and who do not risk or offer to invest a dollar in reliance thereon.
Now it cannot be said that it would not be worth while for anybody to appear and offer more, because when this transaction was closed it was within the power of the council, under the statute, to have sold that plant at a private sale at a price net less than this bid. It is a homely saying, but we think it has been used in this case quite appropriately with respect to tlie value of this property upon the market when you come to offer it for sale, as indicated by the bids and offers, and the absence of greater offers, that “The proof of the pudding is in the eating thereof.”
There must be a clear abuse of corporate power upon the part of a legislative body to authorize a court to interfere, or to justify it in so doing. The administration ot the affairs of the city is by the law entrusted to the council and officers of the city, and the council in matters of this kind is invested with a wide and extensive discretion, and so long as it keeps within its powers, its authority is supreme and not subject to the supervision or interference of the courts. •
It is not suffioient for us to find that a better price might have been obtained, oi that in our judgment a different course should have been pursued. 'When we find that the course has been pursued that the statute marks out, and that the necessary steps have been taken, that is as far as we are authorized to go in that direction. To authorize us to interfere upon the mere ground that the price is not sufficient, it seems to us it should be so much less than would probably be obtained by again offering the property,that it might be said by all men of fair judgment that the acceptance of the bid was a reckless and improvident act, and we do not think that that case is presented here.
I have spoken of the fact that according to the testimony of *626 witnesses it appears that iron at this time had reached a very high figure, yet this was the best price which was offered, and the best price which has been offered since; and that the price of pipe was not likely to remain at so high a figure, was a matter to be fairly considered and contemplated by tnose who were in the market buying and selling. That it was but the exercise of good judgment to assume, as we must suppose they did. that the prices would not remain at that figure, is evidenced by the fact that since that time it has fallen 25 per cent, as witnesses testify, so that the price is one-fourth less in the market than it was at the time this bid was accepted.
1 will not extend the discussion farther. I have taken much time in the discussion of this case because of the importance of the questions and issues involved to the city and the inhabitants thereof as well as the Kerlin Brothers Company,and the interest manifested by the public, all of which have seemed to require or at least justify that course.
The judgment of tbe court is that there shall be an injunction issued in the equity case, with respect to tbe inside property only, lhe cross petition in the replevin case will be dismissed. That will leave the replevin case still pending in the court below. And we are of the opinion that as this results partly in favor of one contestant and partly in favor of the other, they prevailing respectively as to practically equal parts of the property, the costs should be equally divided.